[No. A046309. First Dist., Div. Two. Jan. 29, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY ADAM KEENAN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for partial publication. The portions directed to be published follow.

**COUNSEL**

Robert H. Flannery, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Jeremy Friedlander, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—Appellant Jeffrey Adam Keenan appeals following his conviction of burglary (Pen. Code, § 459), forcible rape (Pen. Code, § 261, subd. (2)), forcible sodomy (Pen. Code, § 286, subd. (c)), mayhem (Pen. Code, § 203), false imprisonment (Pen. Code, § 236), assault with force (Pen. Code, § 245, subd. (a)), attempted burglary (Pen. Code, §§ 664/459) and attempted rape (Pen. Code, §§ 664/261, subd. (2)). He contends (1) his confession was improperly obtained and involuntarily given; (2) the evidence was insufficient to support a conviction for mayhem; (3) the court chose the aggravated sentence for mayhem based on an improper and inadequate basis; and (4) the sentences on the false imprisonment and assault conviction must be stayed pursuant to Penal Code section 654.[1]

### STATEMENT OF THE CASE

An information filed in San Mateo County Superior Court on January 13, 1989, and amended May 18, 1989, charged appellant with the following offenses:

| Count | Penal Code Section | Offense | Special Allegations (Pen. Code § ) |
|-------|--------------------|---------|------------------------------------|
| 1 | 459 | Burglary | |
| 2 | 261(2) | Forcible rape | |
| 3 | 286(c) | Forcible sodomy | Armed (knife) (12022.3(b)) |
| 4 | 203 | Mayhem | |
| 5 | 236 | False imprisonment | |
| 6 | 245(a) | Assault w/force | |
| 7 | 664/459 | Attempted burglary | Knife use (12022(b)) |
| 8 | 664/261(2) | Attempted rape | |

On May 15, 1989, following a hearing, the trial court denied appellant's motion to suppress his taped confession as involuntarily given. On May 16, 1989, the trial court denied appellant's motion for substitute counsel. Immediately following that ruling, appellant waived his right to trial by jury and submitted his case on the transcript of the preliminary hearing and the evidence adduced at the previous day's voluntariness hearing. Following a short recess, the court found appellant guilty as charged, but for the special allegation accompanying count 7, which the court found not true.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

On June 13, 1989, appellant was sentenced to consecutive terms totaling 28 years in state prison, calculated as follows:

| Count | Pen. Code Section | Consecutive | Concurrent | Stayed |
|---|---|---|---|---|
| 1 | 459 | | | (4) |
| 2 | 261(2) | 8 | | |
| 3 | 286(2) | 8 | | |
| | 12022.3(b) | 2 | | |
| 4 | 203 | 8 | | |
| 5 | 236 | | (3) | |
| 6 | 245(a) | 1 | | |
| 7 | 664/459 | | | (2) |
| 8 | 664/261(2) | 1 | | |

Count 2 was designated the principal sex-offense term; the full-term sentences on counts 2 and 3 were imposed pursuant to section 667.6, subdivision (d); count 4 was designated the principal nonsex offense term; the sentences imposed on counts 2, 3, and 4 reflect the upper term for each; the sentences imposed on counts 6 and 8 were one-third the applicable mid-terms; and all sentences but that on count 5 were to run consecutively.

Appellant's notice of appeal was timely filed on June 19, 1989.

## STATEMENT OF THE FACTS

On September 17, 1988, Kathleen H. lived in a ground floor apartment in a Foster City apartment complex. At approximately 5:15 a.m. she was awakened by a man who was strangling her. It was dark and she could see only his silhouette. He ordered her not to scream and warned, "Burglars are not kind." After about four minutes, when Ms. H. had lost all muscle control and was about to lose consciousness, her attacker released his grasp.

Ms. H. urged her assailant not to hurt her cats, and not to take a ring and antique watch that had belonged to her deceased mother. The attacker stuffed a dishrag in her mouth, pulled two pillowcases over her head and tied them around her mouth with a lamp cord. He also tied her hands behind her back with the telephone cord, which he had cut.

The man went to find Ms. H.'s jewelry. When he returned he sat on top of her and burned both breasts with a lit cigarette. At the time of the preliminary hearing, three and one-half months after the attack, she still had scars remaining from those burns. The man then removed Ms. H.'s underpants and raped her.

The attacker went into her living room and Ms. H. heard him going through her belongings. He opened the refrigerator, turned on the stereo and changed the channel to a country-western station.[2] He returned to the bedroom and sodomized her. A few moments later he untied her hands, which had become numb, and began rubbing them. He removed three rings from her fingers and left the room. Ms. H. heard the dishwasher go on; the assailant explained he put the jewelry in the dishwasher to remove any fingerprints. He left shortly thereafter.

Ms. H. tried to call the police, but her phone lines were cut. She went to a neighbor, who did not respond, and then to the building manager, where she made the call.

Ms. H. testified that the window in the dining room was broken; she later noticed $41 was missing from her wallet. When she opened the dishwasher she found her jewelry, the telephone cord that had been used to tie her wrists, and a condom. The apartment manager replaced the broken window the same day.

Norman Sayre was Ms. H.'s neighbor during December 1988. At approximately 2:35 in the morning on December 17, 1988, Sayre was on the patio outside his apartment. He noticed it seemed unusually dark and saw the light outside the manager's apartment was out. As he was suspicious, he stood very still and listened. He saw a man walking in the apartment complex; at one point the man came within approximately eight feet and Sayre had a direct view of him.

Waiting quietly awhile longer, Sayre knew the strange man had remained in the complex because he did not hear the squeaky entrance gate open. He went into his apartment and called the police. The police apprehended a suspect shortly thereafter. At the police department later that morning Sayre identified the suspect (appellant) as the man he had seen from his patio. Sayre also identified appellant at the preliminary hearing.

Officer Scott Welch was a Foster City police officer dispatched in response to Sayre's call. He testified he saw a suspect emerge from a small tree near apartment #1, Ms. H.'s apartment. He chased the man, who appeared to be pulling gloves off his hands. When Officer Welch reached him he placed him under arrest for prowling. The officer found a knife and two socks on the ground next to the suspect. At the preliminary hearing Officer Welch identified appellant as the suspect he apprehended that night. Officer Welch also testified that when he returned to apartment #1 and examined

---

[2] Appellant later explained he changed the radio to a country-western station because he thought the police would then search for someone who (unlike appellant) listened to country music.

the window he saw the glass was cracked and it appeared as though something had chipped away at it.

Corporal William Clark of the Foster City Police met with appellant on the morning of December 17, 1988. He read him his *Miranda* rights; appellant said he understood those rights and indicated his willingness to talk. Appellant told him he had been drinking at a restaurant across the street from the apartment complex and had gone there to urinate. According to appellant, when he heard voices and saw flashlights he became frightened because he was urinating in public.

Appellant denied he had been wearing socks on his hands, and explained he was not wearing socks on his feet when he was caught because he normally wears tennis shoes (although he was wearing shoes when arrested). Appellant also denied his socks were found near him and claimed he did not own the knife discovered next to him. According to Officer Clark, appellant spoke freely and never requested a lawyer.

Sergeant Sonnenberg of the Foster City Police Department testified he was contacted by the police dispatcher at approximately 3:05 a.m. on December 17. As he was en route to the location of appellant's arrest he realized this was the site of a rape the previous September. When he looked into appellant's car he noticed a maroon-colored cigarette lighter that matched the description of a lighter taken from Ms. H.'s apartment.

At approximately 6:55 a.m. Sergeant Sonnenberg went in to interview appellant. He was aware that Corporal Clark had already *Mirandized* appellant, and appellant had agreed to talk. Sergeant Sonnenberg nonetheless asked if appellant wished to talk, and he said, "yes." Sonnenberg testified he made no threats or promises to induce appellant to talk, and appellant never expressed a desire to speak with a lawyer or a desire that the questioning cease.

At the suppression hearing Sergeant Sonnenberg gave a detailed description of his interviews with appellant. He first met with appellant at approximately 6:30 a.m. on December 17. When he initially encountered appellant in the holding cell appellant was sleeping; Sergeant Sonnenberg woke him and asked him to step into the interview room. Appellant was very groggy and his eyes were bloodshot. The officer noticed appellant was shivering and gave him cloth shoe covers for his bare feet. He also gave appellant a cigarette, which he smoked. After approximately five to ten minutes appellant was more fully awake and the interview began.

Sergeant Sonnenberg had been specially trained in interview and interrogation techniques designed to elicit the truth from a reluctant suspect. He

first conducted a brief interview, called a "behavioral analysis inventory," where he tried to evaluate appellant's "truth-telling style" so he could determine when appellant was lying. When after a short break appellant looked as though he had fallen asleep again, Sonnenberg gave appellant a few minutes to wake up.

Sergeant Sonnenberg began the second interview by telling appellant the police reports clearly indicated his guilt. The sergeant asked appellant if he wished to talk; appellant said he didn't know if he could trust him. The sergeant assured appellant he was an honest person, and just wanted to hear the truth. He advised appellant he had no control over what would happen in court but told him he would inform the judge that appellant had been cooperative. The officer testified he never threatened appellant and specifically told him he had no power to make any promises to him concerning the outcome of his case or the sentence he might possibly face. On several occasions appellant became tearful; Sergeant Sonnenberg offered him words of support and told him he was not a bad person but had simply made "a mistake." This conversation lasted for approximately 45 minutes. During cross-examination Sergeant Sonnenberg admitted he falsely told appellant his fingerprints had been found at the scene; he also warned appellant that DNA analysis of his ejaculate could tie him to the rape. Finally, appellant said, "I always trust my instincts and my instincts tell me I can trust you."

Appellant told Sonnenberg he had been drinking earlier and did not want to drive. He realized he needed to go to the bathroom; the bar had closed so he decided to go across the street to the apartment complex. Appellant described how he went into the bushes and began breaking the window and removing pieces of glass. At this point Sergeant Sonnenberg stopped him and asked if he was referring to the evening past, or the September incident. Appellant acknowledged he was talking about what happened in September.

Appellant continued to describe the September crimes. He stated that during July or August he had seen Ms. H. get out of her car and walk into her apartment. After that time he returned to her apartment several times. Appellant admitted that on the morning of the rape he first used the back end of a knife to knock out pieces of the window and then crawled into the apartment. He used the knife to cut the telephone and lamp cords, which he intended to use to tie his victim. Appellant told the sergeant he tied up the victim and then raped and sodomized her. According to the sergeant, appellant became "very, very defensive" when he discussed the sodomy and asserted it was "an accident."

Later in the interview Sergeant Sonnenberg asked appellant if he had burned his victim. The sergeant recalled, "[i]t seemed to bother him a great

deal when I would mention it. It was like somebody had poured cold water on him. He would sit up straight and get a very astonished look on his face." Appellant acknowledged that "out of curiousity" he had put his lit cigarette against her skin "to see what would happen." Appellant also told the sergeant he had removed the victim's rings and placed them, along with some other jewelry, in the dishwasher.

The officer then asked appellant if he had returned to the apartment on December 17 to commit similar crimes. Appellant admitted this was his intention, but said he "wasn't sure what would happen once he was inside."

At the hearing to suppress his confession appellant testified Sergeant Sonnenberg told him the police had recovered blood, fingerprints and semen from Ms. H.'s apartment that matched appellant's. Appellant also asserted the sergeant told him he "had influence" with the judges and the district attorneys and that things would be "easier" for appellant if he cooperated. Sergeant Sonnenberg expressly denied making such claims. According to appellant, he decided to tell the police "everything" because the evidence was so incriminating.

DISCUSSION

I.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

II.

Appellant contends his mayhem conviction cannot stand because mayhem is reserved for only the most disfiguring and disabling attacks and, in comparison to other mayhem cases, Ms. H.'s injury was minor. In support of this claim appellant first marshals historical evidence to show the modern crime of mayhem derives from statutes punishing the most savage type of assaults. He also attempts to show the mayhem statute was not designed to encompass the conduct involved here, as far more vicious conduct is less severely punished under other provisions of the Penal Code.

Section 203 provides that "[e]very person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." Mayhem, an older form of the word "maim," was at common law restricted to injuries that "substantially reduced the victim's formidability in combat" (*Goodman* v. *Superior Court* (1978) 84 Cal.App.3d 621, 623 [148 Cal.Rptr. 799]); the rationale

* See footnote, *ante,* page 26.

being to preserve the king's right to the military services of his subjects. Gradually, the crime evolved to include injuries that did not affect the victim's fighting ability. Our current mayhem statute is based upon the Coventry Act of 1670,[5] which first broadened mayhem to include mere disfigurement. That statute imposed a sentence of death on any person who, with malice aforethought, "cut out or disable[d] the tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable[d] any limb or member of any other person." (*Goodman, supra,* at p. 624.)

While many contemporary mayhem cases involve conduct that squarely fits the traditional understanding of the offense (see, e.g., *People v. Green* (1976) 59 Cal.App.3d 1 [130 Cal.Rptr. 318] [eye rendered useless]; *People v. Caldwell* (1984) 153 Cal.App.3d 947, 952 [200 Cal.Rptr. 508] [half of victim's lower lip bit off]; *People v. Lopez* (1986) 176 Cal.App.3d 545, 548 [222 Cal.Rptr. 101] [victim left legally blind]), courts recently have expanded mayhem to include acts not within the original definition of the crime. Thus, in *People v. Newble* (1981) 120 Cal.App.3d 444 [174 Cal.Rptr. 637] the court upheld a conviction for mayhem based upon the infliction of a three-inch long facial wound and observed, " 'the modern rationale of the crime [of mayhem] may be said to be the preservation of the *natural completeness and normal appearance* of the human face and body.' " (120 Cal.App.3d at p. 451, italics added.) Similarly, in *People v. Page* (1980) 104 Cal.App.3d 569, 578 [163 Cal.Rptr. 839] the court reasoned that "[t]he law of mayhem as it has developed protects the integrity of the victim's person," and affirmed a mayhem conviction based on the application of permanent tattoos to the victim's breast and abdomen. Although appellant argues the newer cases represent the worst form of judicial activism, we see them as practical and proper applications of an old statute to modern-day reality. We thus reject appellant's claim that we are bound to reverse his conviction because his conduct did not fall within the ancient definition of mayhem.

■ Appellant further complains his conduct cannot legitimately be punished as mayhem because more heinous attacks are punished less severely under other provisions of the Penal Code. He urges us to interpret section 203 to exclude his conduct "in order to achieve harmony among the [various statutes]." (*People v. Morris* (1988) 46 Cal.3d 1, 16 [249 Cal.Rptr. 119, 756 P.2d 843]; accord *People v. Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274] ["similar statutes should be construed in light of one another"].)

Appellant first refers to section 243, subdivision (d), which provides a maximum penalty of four years imprisonment for a battery causing "serious

---

[5] According to Blackstone, the act was "occasioned by an assault on Sir John Coventry in the street, and slitting his nose, in revenge (as was supposed) for some obnoxious words uttered by him in Parliament." (LaFave & Scott, Handbook on Criminal Law (1972) at p. 614, quoting 4 Blackstone's Commentaries 207 (1769).)

bodily injury," defined, in part as "serious disfigurement." Appellant reasons that if a battery causing serious disfigurement is only punishable by a four-year sentence, mayhem, which carries a possible eight-year sentence, must necessarily reach more vicious and dangerous conduct. He makes analogous arguments with respect to sections 244 (using caustic chemicals to injure or disfigure; maximum four-year sentence) and 245, subdivision (a) (assault with a deadly weapon causing great bodily injury; maximum four-year sentence).

Though it has some appeal, this argument is ultimately unavailing. First, the difference between the maximum mayhem sentence and the other penalties noted may not be as extreme as initially appears: if, as is often the case, great bodily injury enhancements are added to the maximum penalties under sections 244 and 245, subdivision (a), those crimes could be punished by a seven-year (rather than a four-year) sentence.

Appellant's contention is more fundamentally flawed because it is built upon the false assumption that the provisions of the Penal Code must be precisely calibrated to provide increasingly severe penalties for increasingly violent conduct. As has been pointed out, the "guiding principle" to which Anglo-American jurisprudence adheres "is that of a proportion within a system of penalties between those imposed for different offences where these have a distinct place in a commonsense scale of gravity. This scale itself no doubt consists of very broad judgements both of relative moral iniquity and harmfulness of different types of offence: it draws rough distinctions like that between parking offences and homicide, or between 'mercy killing' and murder for gain, but cannot cope with any precise assessment of an individual's wickedness in committing a crime (Who can?) Yet maintenance of proportion of this kind may be important: for where the legal gradation of crimes expressed in the relative severity of penalties diverges sharply from this rough scale, there is a risk of either confusing common morality or flouting it and bringing the law into contempt." (Hart, Punishment and Responsibility: Essays in the Philosophy of Law (1968) at p. 28.) The sentences the Penal Code prescribes for mayhem are not in our view so disproportionate to those prescribed for other violent offenses that may result in disfigurement as to confuse common morality or bring the law into contempt.

Nor are we morally or otherwise offended by the application of the mayhem statute to this case. ■ ■■■ ■ While the injury suffered by Ms. H. may not have been as disfiguring as some of the more vicious mayhem cases cited by appellant, it quite clearly involved a serious

permanent[6] disfigurement within the meaning of the statute. ▮▮▮ As the Attorney General observes, if the burns had been inflicted on Ms. H.'s face there would be no question that mayhem had been committed. The fact that they are on a normally unexposed portion of her body does not render them any less significant. The marks intentionally burnt upon Ms. H.'s breasts will for the rest of her life serve as a daily reminder of appellant's grotesque assaults. These scars are not simply "an impairment of comeliness" (2 La Fave & Scott, Substantive Criminal Law, § 7.17, p. 321, and cases there cited), but resulted from what must be considered a deliberate effort to degrade Ms. H. Because the disfiguration of Ms. H.'s breasts represents such an intentional violation of the integrity of her person, and because of the emotional disability that frequently attends a mutilation of this sort (see *Goodman* v. *Superior Court*, *supra*, 84 Cal.App.3d at p. 625), appellant properly stands convicted of mayhem.[7]

### III., IV.*

. . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Benson, J., and Peterson, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 17, 1991.

---

[6] In the absence of any evidence to the contrary, we assume that the scars Ms. H. suffered, which remained three and one-half months after the attack, were permanent. (See LaFave & Scott, Handbook of Criminal Law, *supra*, p. 615 [the disabling injury must be permanent]; Perkins & Boyce (3d ed. 1982) Criminal Law, p. 242 [same].) The fact it might be medically possible to remove the scars, which is also not shown by the record in this case, would in any event be insufficient to alleviate the offense. (*Perkins* v. *United States* (D.C. App. 1982) 446 A.2d 19, 26; *United States* v. *Cook* (1972) 149 App. D.C. 197 [462 F.2d 301, 304, fn. 23]; *Lamb* v. *Cree* (1970) 86 Nev. 179 [466 P.2d 660, 663]; *Slattery* v. *State* (1874) 41 Tex. 619, 622.)

[7] Our conclusion is unaffected the recent decision in *People* v. *Pitts* (1990) 223 Cal.App.3d 1547 [273 Cal.Rptr. 389]. In *Pitts*, the defendant, wielding a box cutter, repeatedly slashed his victim and nearly severed her left breast. On appeal, the court concluded great bodily injury is an element of mayhem and that an enhancement for great bodily injury (§ 12022.7) is thus inappropriate. (223 Cal.App.3d at pp. 1559-1560; see § 12022.7 [prohibiting use of enhancement for great bodily injury where "infliction of great bodily injury is an element of the offense"].) Appellant relies on *Pitts* as support for his claim that mayhem requires proof of great bodily injury, which he claims is missing. Our decision today is not at all at odds with *Pitts*. We agree mayhem requires great bodily injury, but simply disagree with appellant's opinion that it is lacking in this case.

\* See footnote, *ante,* page 26.