[No. B082141. Second Dist., Div. One. June 4, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DAMIAN MONROE WILLIAMS, Defendant and Appellant.

**COUNSEL**

Edi M. O. Faal, under appointment by the Court of Appeal, and Wilma R. Shanks for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MASTERSON, J.**—Damian Monroe Williams appeals from the judgment entered following a jury trial that resulted in his conviction of mayhem and four counts of misdemeanor assault. (Pen. Code, §§ 203, 240, 241.)[1] We affirm.

## BACKGROUND

Since appellant does not dispute the sufficiency of the evidence, a short summary will suffice. On the evening of April 29, 1992, after the not guilty verdicts were made public on the case against the Los Angeles police officers who beat Rodney King, appellant engaged in a series of criminal acts. He hurled a brick at Reginald Denny, hitting him in the head, after Denny had been dragged out of his truck and beaten by several other individuals. Appellant also shattered the windshields of Alicia Maldonado Doby's car and Takao Hirata's Bronco while each was still inside, struck Jorge Gonzales, and spray-painted Fidel Lopez's face.

Appellant's defenses were mistaken identity, that he lacked the specific intent to injure or kill due to "group contagion behavior," and that Denny was not permanently disfigured.

## ISSUES

Appellant contends that the trial court erred when it (1) denied his expert an opportunity to conduct a physical examination of Denny, (2) denied his discovery request, (3) limited cross-examination of certain witnesses, (4) admitted certain scientific evidence, (5) refused to admit certain impeachment evidence, (6) gave an instruction on consciousness of guilt (CALJIC No. 2.06), and (7) dismissed juror No. 373. Appellant also contends that (8) the prosecutor engaged in prejudicial misconduct and (9) that he should not have received a consecutive term for the mayhem offense.

## DISCUSSION

1. *Denial of a physical examination of victim Denny*

■ Appellant contends that the trial court erred in denying his request for a physical examination of Denny. We disagree. Appellant's expert, Dr. Leonid Prutsok, was given full access to Denny's medical records and X-rays and testified at trial that Denny's injuries, "if [left] untreated, would be permanent."

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

The record reflects that appellant desired that Dr. Prutsok conduct a physical examination of Denny in order to ascertain whether his injuries could be corrected through plastic surgery. Appellant apparently expected to use such evidence to show that Denny did not suffer "permanent" injuries. However, the possibility that a victim's disfigurement might be alleviated through reconstructive surgery is no bar to a finding of "permanent" injury. (*People* v. *Hill* (1994) 23 Cal.App.4th 1566, 1572-1574 [28 Cal.Rptr.2d 783]; *People* v. *Keenan* (1991) 227 Cal.App.3d 26, 36, fn. 6 [277 Cal.Rptr. 687].) Since appellant was privy to Denny's medical records and since an examination would not have uncovered relevant evidence, the trial court did not err in denying appellant's request.

## 2. *Denial of discovery*

■ Appellant contends that the trial court erred in denying his request to discover information concerning the People's alleged discriminatory prosecution practices. (*Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 300-301 [124 Cal.Rptr. 204, 540 P.2d 44].) We disagree.

Appellant was charged with willful, deliberate and premeditated attempted murder and aggravated mayhem. (§§ 664/187, 205.) Appellant filed a discovery motion to compel production of, inter alia, a statistical summary regarding arrests and prosecutions for the above mentioned crimes in Los Angeles County for the preceding 14 years, under a theory of either direct perpetration or aiding and abetting. Appellant sought statistics regarding three specific defendant classifications: (1) African-Americans and Hispanics, (2) Caucasians, and (3) law enforcement officers. Appellant also requested the number of prosecutions of law enforcement officers involving the use of excessive force and the charges filed against the officers, i.e., whether they were prosecuted for attempted murder or aggravated mayhem.

In support of his motion, appellant submitted a declaration from defense counsel citing several assaultive incidents in which the victim's injuries purportedly were similar to those suffered by Denny. Two of the incidents involved defendants who were Caucasian and the remaining incidents involved defendants who were identified as law enforcement officers, including the Rodney King beating incident.[2] Appellant also presented a statement by a veteran Los Angeles Police Department detective who reported that in excessive force cases Los Angeles police officers were not charged with aggravated mayhem or attempted murder, even in incidents where the victim suffered serious injuries or death.

In response, the People presented declarations from two attorneys in the Los Angeles District Attorney's office, one of whom was assigned to this

---

[2]Appellant did not make known the race of the law enforcement officers.

case. The declarations stated that, as a rule and in this case, prosecutorial decisions were not made on the basis of a defendant's race or ethnicity. Instead, the decision to charge appellant was based on the strength of the available admissible evidence.[3] The trial court denied appellant's motion, finding that appellant had failed to make a prima facie case of discriminatory prosecution and had not set forth a plausible justification for the items sought.[4]

■ "In the course of a criminal proceeding, a defendant may object to maintenance of the prosecution on the ground of deliberate invidious discrimination in the enforcement of the law. [Citation.] Traditional discovery principles are applicable so that defendants may be permitted to discover information relevant to such a claim. [Citation.]" (*People* v. *Moya* (1986) 184 Cal.App.3d 1307, 1310 [229 Cal.Rptr. 402].) "Although a defendant seeking discovery is 'not required to meet the standard of proof requisite to the dismissal of a discriminatory prosecution' [citation], discovery is not a fishing expedition. A motion for discovery must ' "describe the requested information with at least some degree of specificity and . . . be sustained by plausible justification." ' [Citation.]" (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1171 [9 Cal.Rptr.2d 834, 832 P.2d 146].) ■ The standard of review for a ruling on a motion to compel discovery is abuse of discretion. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 979 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

■ There was no abuse of discretion. Law enforcement officers and ordinary citizens are not similarly situated in terms of the lawful use of force. With few exceptions not applicable here, citizens may not lawfully use force against other persons. In contrast, law enforcement officers are permitted the use of force in the course of their duties and are only prohibited from using *excessive* force. (§ 835a.) "A comparison of the number of prosecutions brought would tell us nothing about how many should have been brought against the respective members of those unlike classes." (*Robinson* v. *Superior Court* (1978) 76 Cal.App.3d 968, 983 [143 Cal.Rptr. 328].)

Given (1) appellant's meager production of relevant evidence in support of his claim that he was singled out for prosecution because of his race (cf.

---

[3]The People also submitted declarations from systems employees of both the district attorney's office and the Los Angeles Police Department, stating that information concerning the direct perpetration of attempted murder and aggravated mayhem was not readily available and could not be produced without the expending of additional employee-hours and funding. Furthermore, a statistical survey concerning aiding and abetting of the aforementioned crimes could be compiled only through a manual search of case files.

[4]The court further found that the production of the requested evidence would create an "unreasonable delay in bringing the case to trial."

*Murgia* v. *Municipal Court, supra,* 15 Cal.3d at p. 301) and (2) the People's evidence that appellant's race played no role in the instant prosecution, the trial court's denial of appellant's discovery request did not exceed the bounds of reason or proper discretion. (*People* v. *Moya, supra,* 184 Cal.App.3d at pp. 1312-1313; cf. *People* v. *Ochoa* (1985) 165 Cal.App.3d 885, 887-889 [212 Cal.Rptr. 4].)

### 3. *Motion to dismiss*

■ We reject appellant's contention that the trial court prejudicially erred when it required that he produce offers of proof regarding certain witnesses and limited the scope of examination of other witnesses at the hearing on his motion to dismiss.

Before trial, appellant moved to dismiss the charges on the basis of discriminatory prosecution. (*Murgia* v. *Municipal Court, supra,* 15 Cal.3d at pp. 300-301.) Appellant informed the court that he would call several witnesses to testify at the hearing, including former Los Angeles County District Attorney Ira Reiner and Deputy District Attorney Terry White, the lead prosecutor in the state's case against the police officers who beat Rodney King. The trial court ordered that both parties produce offers of proof concerning the relevancy of any witness's testimony, making exceptions for witnesses Reiner and White after appellant represented that they would testify to circumstances surrounding the beating of King. At the same time, the court required that appellant demonstrate why the instant case was similar to the King beating case or any other case to which appellant sought comparison. The court specifically stated that it did not want the motion to dismiss to turn into a "re-trial" of the King beating case.

At the hearing on the motion to dismiss, appellant submitted detailed offers of proof describing various abusive instances involving law enforcement officers. The court found that appellant failed to establish a "prima facie" showing of similarity between the instant case and law enforcement misconduct cases. Consequently, the court disallowed any testimony concerning the latter situations. After hearing testimony from witness Reiner in which he denied that appellant's race played any role in his decision to prosecute, the trial court denied appellant's motion to dismiss, finding that appellant presented no evidence of discriminatory prosecution.

The trial court correctly precluded the evidence concerning attacks by law enforcement officers. As noted, ordinary citizens such as appellant are not similarly situated to law enforcement officers. Accordingly, any comparison of the prosecutorial decisions concerning the two groups would not have

assisted the court in determining whether appellant was the victim of intentional and purposeful discrimination. (*Robinson* v. *Superior Court, supra*, 76 Cal.App.3d at p. 983.)

Appellant argues that the trial court's decision interfered with his constitutional rights to confront and cross-examine witnesses. It is true that a trial court's authority to exclude relevant evidence must yield to a defendant's right to a fair trial. (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312-313, 93 S.Ct. 1038].) However, since the evidence in question here was not relevant, its exclusion did not render appellant's trial unfair. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 372 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 684-685 [248 Cal.Rptr. 69, 755 P.2d 253].)

Appellant also appears to challenge the trial court's requirement of an offer of proof. Whether or not the trial court erred in so requiring (see, e.g., *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 103 [104 Cal.Rptr. 226, 501 P.2d 234]; *People* v. *Singletary* (1969) 276 Cal.App.2d 601, 604 [81 Cal.Rptr. 79]), appellant has failed to establish prejudice. Even assuming that the offers of proof were true, they primarily pertained to incidents in which the suspects were law enforcement officers. Since appellant was not a law enforcement officer (cf. *Griffin* v. *Municipal Court* (1977) 20 Cal.3d 300, 307 [142 Cal.Rptr. 286, 571 P.2d 997]), such incidents were irrelevant as to him. Accordingly, there was no need for the trial court to further explore the subject.[5] (See *People* v. *Hoiland* (1971) 22 Cal.App.3d 530, 538 [99 Cal.Rptr. 523].)

4. *Kelly hearing (People v. Kelly (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240])*

A newspaper photographer took a picture from a helicopter of a man as he threw a brick at Denny's head. This man appeared to have an undefined mark on his left arm. At trial, it was established that appellant had a rose tattoo on his left arm.

The photograph was taken to Cognitech, Incorporated, a Santa Monica image processing and devices laboratory, for the purpose of undergoing a procedure known as segmentation.[6] In a hearing out of the presence of the jury to determine the reliability and acceptance of segmentation, Dr. Leonid

---

[5]Appellant presented no evidence at the hearing with respect to the two instances involving Caucasian civilian suspects.

[6]Cognitech was also hired by the prosecutor to "digitize" other photographs and video tapes. Appellant did not object to the digitized evidence.

Rudin, Cognitech's director of research and development, testified that segmentation is a technique involving computers and mathematical formulas wherein the boundaries and regions of a photographic image are extracted based upon their color or luminance. The image is then "mapped" through a mathematical formula to create a more discernible image. Dr. Rudin stated that segmentation had primarily been used in the medical field, e.g., locating the precise boundaries of brain tumors and tracking their development, and the environmental field, e.g., locating pollution or hazardous waste sites. He cited several articles and books on segmentation and stated that it was commonly accepted and used in the image processing field. He further stated that he was not aware of any other court case in which segmentation was used for identification purposes. The trial court overruled appellant's objection to Dr. Rudin's testimony, stating that it was "firmly convinced" of Dr. Rudin's expertise. The court further found that, based on the evidence of its use in the medical field, the process of segmentation met "the threshold requirement for reliability[.]"

■ Appellant contends that the admission of the segmentation evidence was error because the prosecution failed to demonstrate that the process was accepted or reliable, or that the correct segmentation procedures were conducted in the process. Appellant's latter contention concerning the correctness of the procedure used has been waived, as defense counsel expressly agreed that hearing was "limited to the reliability and the acceptance" of segmentation. (See *People* v. *Diaz* (1992) 3 Cal.4th 495, 528 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

The test for determining the reliability of a new scientific technique is whether the technique is ". . . *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' (Italics added.)" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30.) The People have met that test. Dr. Rudin testified to the general acceptance of segmentation for identification purposes and cited several supporting texts authored by image processing experts. No evidence was presented in opposition. Moreover, we do not find the lack of documented uses of the procedure in court cases to be fatal to the court's determination of reliability.

Appellant claims that Dr. Rudin's own testimony revealed that the process was unreliable because he was unable to state with precision whether the processed image was a rose or flower tattoo. Appellant misses the point. The question before the court was whether the technique of segmentation was reliable, i.e., whether the process would create a discernible picture of the

mark on the arm of the photographed perpetrator. Whether the mark matched appellant's tattoo was for the parties to argue.[7]

Appellant also argues that Dr. Rudin was not qualified to testify on the use of segmentation in the medical field because he lacked a medical background. This claim is absurd. The process of segmentation in the medical field was limited to determining the dimension and growth patterns of the tumors from X-rays provided by medical doctors. It was not used to *diagnose* tumors.

## 5. *Inadmissibility of a letter impeaching witness Robert Tur*

■ Appellant contends that the trial court erred when it refused to admit certain impeachment evidence concerning prosecution witness Robert Tur. We disagree.

In relevant part, Tur testified that that he was able to identify appellant through binoculars while hovering above the attack in a helicopter. Out of the presence of the jury, the trial court conducted a hearing to determine the admissibility of a letter from Assistant City Attorney Timothy Hogan to the prosecution team. (Evid. Code, § 402.) The letter indicated that Hogan was in the midst of an investigation on another matter and had received reports that Tur had given false testimony under oath and had suborned perjury.

Appellant sought admission of the letter to impeach Tur. However, the conduct attributed to Tur was not based on the personal knowledge of Hogan, but instead reflected what he had been told by others. Accordingly, the contents of the letter were hearsay and could not be admitted under either the business or official records exceptions to the hearsay rule. (*People v. Wheeler* (1992) 4 Cal.4th 284, 300, fn. 13 [14 Cal.Rptr.2d 418, 841 P.2d 938]; see *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 815 [156 Cal.Rptr. 765].)

We also find no abuse of discretion in the trial court's decision to preclude appellant from cross-examining Tur on this subject. This decision was based on the court's finding that the subject was a collateral matter and would require extensive litigation as to the truth of the allegations. (Evid. Code, § 352.) "In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation

---

[7]Moreover, if the match was poor, it would in fact have *strengthened* appellant's mistaken identification defense.

. . . . Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler, supra,* 4 Cal.4th at pp. 296-297, fn. omitted.)

## 6. *CALJIC No. 2.06*

■ Appellant contends that the trial court erred in giving CALJIC No. 2.06 on efforts to suppress evidence as a circumstance tending to show a consciousness of guilt.[8] Appellant argues that there was no evidence that he destroyed or concealed evidence. We disagree. The police searched appellant's residence and found certain items of clothing worn by appellant during the attacks (e.g., a splotched T-shirt, a blue bandanna, and a pair of sunglasses). However, they were unable to locate the black and white tennis shoes and dark-colored shorts worn by appellant that day. Thus, it was entirely reasonable to assume that appellant hid certain items of clothing that he wore in order to thwart efforts to establish his identification. Accordingly, the trial court did not err in giving CALJIC No. 2.06. (See *People v. Hannon* (1977) 19 Cal.3d 588, 597-598 [138 Cal.Rptr. 885, 564 P.2d 1203].)

## 7. *Removal of juror No. 373*

■ We reject appellant's contention that the trial court erred when it dismissed juror No. 373 during deliberations.

After several jurors complained of juror No. 373's inability to deliberate, the court conducted a hearing on the matter. At the hearing, several jurors testified that juror No. 373 was inattentive, constantly requested that the jurors take time to organize their notes, forgot previous votes or discussions, and even attempted to alter the jury instructions. For her part, juror No. 373 stated that she thought the other members of the jury were not deliberating properly and that she had changed her vote on certain preliminary issues after listening to deliberations. The court found that juror No. 373 was unable to comprehend simple concepts, was unable to remember events during deliberations such as recent discussions or votes, and was not following the law.

The trial court's decision to dismiss juror No. 373 was not an abuse of discretion given that juror No. 373's conduct apparently transformed the

---

[8]The instruction given, CALJIC No. 2.06, reads as follows: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

deliberation process into an exercise in futility. (§ 1089; see *People* v. *Thomas* (1994) 26 Cal.App.4th 1328, 1333 [32 Cal.Rptr.2d 177] [juror removal supported by good cause where juror refused to deliberate, disobeyed court orders and was inattentive].) Appellant argues that there was no substantial evidence to support the court's findings. We disagree, as the court's findings were supported by the testimony of several jurors.

Appellant suggests that the dismissal of juror No. 373, an African-American woman, was particularly unfair in view of the fact that the court permitted juror No. 104, a Caucasian woman, to remain on the jury. However, appellant never sought the dismissal of juror No. 104 when the situation he presently complains of arose. In any event, the court did not err in this respect. In the early part of deliberations, juror No. 104 complained several times about sequestration and demanded that the jury reach a verdict or "hang" so that she could return to her boyfriend. After the matter was brought to the court's attention, the court spoke with juror No. 104, who stated that she was initially upset because the jurors were not allowed visitors, but that she was no longer feeling "stress[ed]" after learning that the problem would be remedied.

8. *Alleged instances of prosecutorial misconduct*

 Appellant argues that the case must be reversed because of prosecutorial misconduct during closing argument. We disagree.

When commenting on defense counsel's closing argument, the prosecutor asserted that because the facts were against appellant, counsel had to "obscure the truth" and confuse and distract the jury in order "to manufacture doubt even where none exist[ed.]" The prosecutor continued, citing specific examples in which she disagreed with defense counsel's characterization of the facts, and suggested that counsel's argument was not made in "pursuit of the truth" but was instead meant to "deceive," "distract," and "confuse" the jurors.

The prosecutor's remarks were proper in that they served as "a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom." (*People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129].) To the extent the argument could have been construed as a personal attack on the integrity of defense counsel, the effects of such an attack could have been cured by an appropriate admonition to the jury had an objection been timely made. Appellant's failure to object constitutes a waiver of the issue on appeal. (*Ibid.; People* v. *Cummings* (1993) 4 Cal.4th 1233, 1302 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

Appellant next contends that the prosecutor impermissibly suggested that counsel himself believed that appellant was guilty. We disagree. During rebuttal, the prosecutor took exception to defense counsel's attack on the evidence concerning identification, in light of the fact that he presented an alternative and apparently inconsistent theory of defense (group contagion behavior). The prosecutor stated that although counsel urged that appellant was not the perpetrator, "[counsel himself] couldn't stick to that . . . because even he knows it is."

The prosecutor did not assert that defense counsel believed appellant was guilty. Rather, the prosecutor suggested that, given appellant's apparent inconsistent defense of group contagion behavior, defense counsel was conceding the issue of identity. Even assuming that the comment could be construed as appellant suggests, appellant failed to make an objection. Had he done so, the court could have admonished the jury "that the views of counsel were irrelevant," thereby avoiding any potential prejudicial effect. (*People* v. *Bell*, *supra*, 49 Cal.3d at p. 538.) Accordingly, appellant's failure to object constitutes a waiver of the issue on appeal. (*Ibid.*)

9. *Sentencing*

■ We reject appellant's contention that the case must be remanded for resentencing because the trial court relied on improper aggravating factors when it sentenced him to an eight-year consecutive term for the mayhem offense committed against Denny.

The aggravating factors that the court relied on in imposing the upper term were that (1) the crime involved great violence, great bodily harm, and other acts of cruelty, viciousness and callousness; (2) appellant was armed with a weapon; (3) the victim was vulnerable; and (4) there was evidence of planning. The court further found that these aggravating factors more than outweighed the sole mitigating factor of appellant's lack of criminal history. The court then determined that the term be served consecutive to the terms imposed for the other crimes because the attacks were separate incidents involving multiple victims and that appellant's "belated statement of remorse after conviction does not ring true in light of his spitting on the near dead victim and his victory dance after the attack."

Each of the aggravating factors were supported by the record. Even if we were to assume that the factor concerning great bodily harm constituted a dual use of facts and should have been excluded, the remaining factors were more than sufficient to impose the eight-year high term, as a single factor in aggravation is all that is needed to impose the upper term. (*People* v.

*Castellano* (1983) 140 Cal.App.3d 608, 615 [189 Cal.Rptr. 692].) Moreover, the record reflects that appellant's crimes "involved separate acts of violence or threats of violence," thereby justifying the imposition of a consecutive sentence. (Cal. Rules of Court, rule 425(a)(2).) We are confident that, under the circumstances, an order of remand for a clarified statement of reasons would be no more than an idle act. (*People* v. *Blessing* (1979) 94 Cal.App.3d 835, 838-839 [155 Cal.Rptr. 780].)

### DISPOSITION

The judgment is affirmed.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

Appellant's petition for review by the Supreme Court was denied September 18, 1996.