Filed 6/17/26  P. v. Martinez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D086124 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS333027) |
| BREANA DENISE MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos Varela, Judge.  Affirmed.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Robin Urbanski and Brendon Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Breana Denise Martinez repeatedly slashed Jesus M. with a box cutter, leaving scars.  A jury acquitted her of attempted murder (Pen. Code, §§ 187,

subd. (a), 664; count 1) but found her guilty of mayhem (§ 203; count 2) and assault with a deadly weapon (§ 245(a)(1); count 3).

Martinez argues insufficient evidence supports her mayhem conviction because there was no evidence Jesus was permanently disfigured. We disagree. Jesus' treating physician testified that the injuries Jesus sustained could result in permanent scarring, and Jesus' testimony established he had scarring five months after the attack. Accordingly, substantial evidence supports the mayhem verdict.

Martinez also contends the trial court erred in failing to further define "disfigurement" in response to a jury note. We conclude Martinez forfeited this claim by agreeing to the response.

We therefore affirm.

I.

A.

One day in 2024, Jesus and his girlfriend were hanging out on a couch near a fast-food restaurant in National City. According to Jesus, a man and Martinez approached and told them the couch was their spot. Jesus and Martinez verbally argued. Jesus said they would leave and began to run away from Martinez, who looked "real upset." Jesus fell down in a "cornered area." Martinez "swung at" Jesus, and he "started bleeding" from "[d]ifferent parts of [his] body." Jesus was taken to the hospital for treatment, including stitches.

Martinez testified she was alone when she approached the couch to get her belongings and to ask Jesus and his girlfriend to leave. According to her, everyone began yelling, and Jesus hit Martinez "[a]bout four" times and took her phone. Jesus told Martinez "he was going to kill" her. She was scared, so she took out her knife, "chased him, and . . . stabbed him." She cut him "[t]o

2

get him away, to get him down, so [she] could run away." She stopped when she "felt he wasn't a threat anymore."

The jury watched surveillance videos of the incident obtained from several nearby businesses. Several witnesses also testified about the parts of the incident they observed.

B.

The trauma doctor who treated Jesus testified that Jesus sustained four "large," "deep," and "complicated" lacerations needing repair with sutures. These lacerations included a 20-centimeter wound to Jesus' torso that exposed fat; a wound to his left upper arm that "cover[ed] almost the entire length of the arm," injured multiple muscles, and exposed fat; a "contaminated" wound, exposing fat and muscle, to the left thigh; and a 10-centimeter wound to the right lower leg. All four wounds could "[p]otentially" cause permanent scarring.

A cut as deep as the one on Jesus' arm could "[p]otentially" cause permanent damage. "[I]f any nerves were damaged, that could be permanent with either loss of sensation or loss of strength." And "[w]ith multiple lacerations to the muscle, depending on how well they heal, you could have loss of strength, loss of endurance."

The "destructive" laceration on Jesus' shin required removal of some "devitalized tissue," which could "[p]ossibly" result in lasting effects like "significant scarring, which can restrict some . . . movements"; "chronic pain"; and "long-standing, difficult-to-clear infections."

A law enforcement officer who went to the hospital to follow up with Jesus testified that Jesus' arm was "filleted open."

At trial roughly five months later, Jesus testified he "still get[s] pain" from his injuries. He feels "a real cold, numb, burn" in his left arm and a

similar pain in his right leg. He told the jury he has trouble "[p]icking things up" because of his arm's injury. When asked if he had any visible scars from the injuries, Jesus answered, "Of course."

Photographs of Jesus' injuries were admitted at trial.

### C.

The jury found Martinez not guilty of count 1 and the lesser included offense of attempted voluntary manslaughter but found her guilty of counts 2 and 3. As to count 2, the jury found true the allegation that Martinez used a deadly and dangerous weapon in the commission of the offense (§ 12022(b)(1)), and as to count 3, the jury found true that Martinez inflicted great bodily injury upon Jesus (§ 12022.7(a)). Martinez admitted a serious felony prior and a strike prior.

The court sentenced Martinez to a cumulative sentence of 14 years in prison with credit for time served. The court imposed the middle term of four years on count 2, doubled for the strike prior; a stayed middle and doubled term on count 3; a one-year term for the deadly and dangerous weapon allegation; a stayed three-year term on the great bodily injury allegation; and a five-year term for the serious felony prior. The court also imposed various fines and fees and awarded restitution in an amount to be determined.

### II.

### A.

Martinez argues insufficient evidence of disfigurement supports her conviction of mayhem. We disagree.

We review a challenge to the sufficiency of the evidence for substantial evidence. In doing so, we examine the entire record in the light most favorable to the prosecution to determine if a rational factfinder could find

4

the essential elements of the crime beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Substantial evidence is reasonable, credible evidence of solid value, even if circumstantial. (*Ibid.*) "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify" reversal. (*People v. Maury* (2003) 30 Cal.4th 342, 403.) We will not reverse unless under "no hypothesis" whatsoever could substantial evidence support the jury's verdict. (*Zamudio*, at p. 357 [cleaned up].)

Under section 203, "[e]very person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." "Disfigurement of the body impairs or injures the beauty, symmetry or appearance of a person . . . or renders unsightly, misshapen or imperfect or deforms in some manner." (*People v. Romero* (2019) 44 Cal.App.5th 381, 387 [cleaned up].) "[C]ase law has 'grafted' on to section 203 the requirement that a disfiguring injury be permanent." (*People v. Santana* (2013) 56 Cal.4th 999, 1007.) "Permanent scarring constitutes a disfiguring injury." (*Romero,* at p. 387.)

Martinez asserts "there was no direct evidence of scarring, permanent or otherwise, except [Jesus'] testimony that he had scars." But Martinez fails to explain why Jesus' testimony is insufficient to support the disfigurement finding. Direct evidence is not required, and a single witness's testimony may constitute substantial evidence. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) Jesus' treating physician testified that all four wounds, which were long and deep, could "[p]otentially" cause permanent scarring and the laceration over Jesus' shin could "[p]ossibly" result in "significant scarring." Five months after incurring the injuries, Jesus testified he still had scars, confirming the physician's assessment. Given the severity of the injuries and

5

the resulting scars present months later, the jury had more than enough evidence to reasonably infer the scarring was permanent and therefore was a disfigurement under the mayhem statute. (See, e.g., *People v. Johnson* (2018) 21 Cal.App.5th 267, 272, 273, 282 [testimony regarding scars remaining four months after incident sufficient to establish permanent scarring disfigurement for mayhem].)

That the mayhem statute focuses to some degree on the face is irrelevant. It is not limited to the face, and other courts of appeal have found permanent scarring on other parts of the body adequate to underpin a mayhem conviction. (See, e.g., *People v. Keenan* (1991) 227 Cal.App.3d 26, 35-36, fn. 6 [cigarette burn scars on breasts still visible over three months after injury].)

In sum, substantial evidence of permanent disfigurement supports Martinez's mayhem conviction.

B.

Martinez contends the trial court erred by failing to further define "disfigurement" when the jury sent a note asking for clarification of its legal definition. The People contend Martinez forfeited this argument. We agree with the People.

Using CALCRIM No. 801, the trial court instructed the jury on mayhem. The court instructed that, "[t]o prove [Martinez] is guilty of mayhem, the People must prove [Martinez] unlawfully and maliciously: Permanently disfigured someone." Martinez did not object to this instruction as given.

During deliberations, the jury submitted a note "[a]sking for clarification of legal definition of 'disfigur[e]ment.'" The clerk sent all counsel the question as well as the court's proposed response, which read: "Some

6

words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings. CALCRIM 200." The minutes reflect that "[b]oth parties notif[ied] the clerk that they agree[d] with the Court's response to Jury Note 1." The jurors were then provided with the response, which was identical to the proposed response.

Martinez has forfeited this challenge "by specifically agreeing below to the court's handling of the jury's question." (*People v. Harris* (2008) 43 Cal.4th 1269, 1317.) Martinez responds to the People's forfeiture argument by pointing out factual differences in the authorities the People cite for this proposition, but the rule is not limited to cases in which counsel "suggest[ed] the court's response" or "'actively and vigorously lobbied against further instruction.'" (Quoting *People v. Thoi* (1989) 213 Cal.App.3d 689, 698.) Under *Harris*, agreement to the response—as was the case here—is sufficient to forfeit the claim.

Martinez argues section 1259, which allows a court to review unpreserved challenges to jury instructions "if the substantial rights of the defendant were affected thereby," saves her claim from forfeiture. But Martinez cites no authority applying section 1259 to a response to a jury note, much less such a response that merely refers the jury back to another, unchallenged instruction. Even assuming section 1259 applies here, the crux of Martinez's argument is that the instruction was insufficient. Regardless of section 1259, our high court has held that "'[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus

7

needed clarification, without first requesting such clarification at trial.'" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428.) Accordingly, Martinez forfeited this claim.

III.

We affirm.

CASTILLO, J.

WE CONCUR:

McCONNELL, P. J.

DO, J.