Filed 4/22/14  P. v. Avila CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B239400 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA066339) |
| v. | |
| DAVID AVILA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Affirmed as to Avila; affirmed and remanded for resentencing as to Jacquez.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant David Avila.

Katherine Eileen Greenebaum, under appointment by the Court of Appeal, for Defendant and Appellant Andy Jacquez.

Kamala D. Harris, State Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

David Avila and Andy Jacquez were tried together before separate juries. Both were convicted of two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1),[1] counts 2 and 5); battery (§ 243, subd. (d), count 3), false imprisonment by violence (§ 236, count 4) , torture (§ 206, count 6), and dissuading a witness for reporting a crime (§ 136.1, subd. (b)(1), count 8). Avila was also convicted of aggravated mayhem (§ 205, count 7) and receiving stolen property (§ 496d, subd. (a), count 9). Jacquez, although charged with aggravated mayhem in count 7, was found not guilty of that charge but guilty of the lesser charge of mayhem (§ 203). The jury made true findings as to Avila with respect to the two counts of assault with a deadly weapon and false imprisonment, that he caused great bodily injury (§ 12022.7, subd. (a)). In a separate proceeding, Jacquez admitted he had suffered a prior serious or violent felony conviction within the meaning of section 667, subdivisions (b) - (i), 1170.12, subdivisions (a) – (d). They filed separate notices of appeal. Avila contends that his due process rights were violated because there was insufficient evidence to support the aggravated mayhem count, there was insufficient evidence to support all of the counts because the victim's testimony was inherently improbable, the jury was not instructed with the unanimity instruction and thus the torture, assault, battery, false imprisonment and mayhem convictions must be reversed, the jury was not instructed on accomplice testimony; and there was insufficient evidence to support the receiving stolen property conviction. He also joins in any issues raised by Jacquez which inure to his benefit.

Jacquez contends the court should have stayed sentence on count 2, assault with a deadly weapon and count 4, false imprisonment, that the court miscalculated his presentence custody credits, and the abstract of judgment erroneously stated he was convicted of aggravated mayhem instead of the lesser included offense of mayhem. He also joins in any issues raised by Avila which inure to his benefit.

---

[1] All subsequent undesignated statutory references shall be to the Penal Code.

2

At trial, two juries were empaneled. The jury selected for Jacquez's case was referred to as the Purple Jury, and the one selected for Avila's was referred to as the Gold Jury.

James Waldrop testified at trial under a grant of immunity. He admitted he had stolen some tools, a mallet, a radio and car stereo from a parked car. On September 28, 2010, he went to Avila's house on Magnolia Boulevard in Sherman Oaks, hoping to sell the stolen items. He knew Avila and Jacquez through a mutual friend, Nicole Demott. At approximately 3:00 a.m., he dropped the items off at Avila's house and left. He returned at 9:00 a.m. Avila, Jacquez, and Demott were at the house. Demott opened the door, greeted Waldrop, and went into her room. Avila questioned Waldrop about the items and became angry, apparently because they had no value. When Waldrop got up to leave, Avila hit Waldrop two to three times with his fist. Jacquez was standing behind Waldrop. Avila grabbed the mallet Waldrop had brought and repeatedly struck Waldrop in the chest. Then Avila swung the mallet at Waldrop's head, Waldrop blocked the blow with his hand, and the mallet broke a finger. Avila told Waldrop to move his hand and struck Waldrop on his head. Avila and Jacquez hit and kicked him. They ordered Waldrop to go to the garage. Avila escorted him there and ordered him to sit in a chair. Jacquez then entered the garage. Both Avila and Jacquez bound him with electrical cords, and they put a towel in his mouth and wrapped duct tape around his head.[2]

Avila then asked him a series of questions about whether Demott was a snitch. Avila took a gas torch and used it to burn Waldrop's ear if he did not like the answers. The burnings continued for about an hour. Jacquez was pacing back and forth nearby. Then Avila struck Waldrop in the chest, back, and head with the mallet. Jacquez stood by and watched, and then hit Waldrop in the back with his hands. Waldrop first said that Jacquez used the torch on his knee, but later testified Jacquez did not use the torch.

---

[2] At a prior hearing, Waldrop said that Jacquez did not tie him up, but changed his testimony at trial.

Waldrop said he lost consciousness. Later, Avila and Jacquez told him to go out and steal more items or else the same thing would happen again. They warned him not to go to the police or the hospital. They untied him but told him not to leave, and told him to take a shower. Demott gave him clean clothes and bandages.

Avila asked Waldrop to drive him to the store. Then at approximately 1:30 p.m., Waldrop told Avila he had to leave to pick his mother up from work. Avila told him to return after he picked her up.

Waldrop told his mother he had been in a fight. He showed her his injuries, including water blisters which were about one inch high.

Later than night, Waldrop returned to Avila's house. Demott borrowed Avila's car and dropped him off at a friend's house.

In the weeks that followed, Waldrop repeatedly returned to Avila's house and brought stolen items to exchange for drugs.

On or about October 12, 2010, Waldrop was arrested for drug possession while driving a stolen Honda Accord. Los Angeles County Sheriff's Detective Lucas Darland interviewed him and observed his injuries. Waldrop eventually identified Avila and Jacquez. He explained he was afraid to report the incident to police since he feared for his own life and his family. Darland took pictures of Waldrop's injuries.

A search warrant was executed at Avila's house, and deputies recovered a mallet, an orange electrical cord, and a gas torch.

On January 10, 2011, Detective Darland interviewed Jacquez at the police station. At trial, the video recording was played for the Jacquez jury only and the transcript of the interview was admitted as evidence against him only. Jacquez admitted Waldrop came to the house. Avila yelled at Waldrop and hit him with a mallet. Jacquez tried to calm Avila down. He admitted hitting Waldrop in the ribs and face, but said he only did so as a reaction when Waldrop hit him first. Avila took Waldrop to the garage. Jacquez saw Waldrop tied up when he went to the garage. Avila told Jacquez to leave. Jacquez did not see Avila putting the torch to Waldrop's hand but saw Avila with a torch. He then said he saw Avila torch Waldrop's legs and ear. They were all high on

4

methamphetamine. Jacquez thought Waldrop was dead when he lost consciousness in the garage.

Detective Darland took pictures of Waldrop's injuries on his left hand, his head, his ear and his knee. The photographs showed scarring on his hand and knee. His ear was charred, on the lower lobe, behind the ear and inside the ear. There was an L-shaped scar on his head. At trial, Waldrop's skin was pink between his knuckles and on the fingers from the torch. He also had two scars, each the size of a quarter, on one knee. He had a scar on the top of his head where he was struck by the mallet.

Detective Darland accompanied Waldrop to the hospital. Waldrop was given Motrin and was not admitted. The doctor said it was a superficial burn.

The prosecution called an expert arson investigator as a witness, Los Angeles Sheriff's Detective Edward Nordskog. He had seen and interviewed burn victims over 200 times. Nordskog testified that the burns on Waldrop's knee looked like second degree burns but he could not make a conclusion if the injuries to his ear were related to burns. He described how a gas torch would split up the skin layers and burn the underlayers. He said the torch found in Avila's house (Exh. 17) "is about as hot a flame as you can get in the commercial world." Nordskog admitted he only had a little medical training in the military and did not review any medical reports in this case.

In December 2011, Waldrop and Avila were both in the interview room of the Men's Central Jail. Avila apologized to Waldrop for what he had done and said he did not want to be in jail so he could see his children.

Waldrop admitted he used methamphetamine daily. He admitted he had been so addicted that he would lie, cheat and steal in order to obtain more methamphetamine. Waldrop also admitted he had been punched in the ear by another drug dealer. Waldrop was convicted of felony taking of a vehicle and burglary of a vehicle due to the facts in this case. He was placed on probation. He was later arrested on a narcotics charge and was in custody when he testified.

*Receiving Stolen Property*

Spencer Floyd owned a black 2007 Audi. On October 3, 2010, he parked it in front of his house. The next morning the car was gone. Los Angeles County Sheriff's Detective Mike Marino found the Audi in the alley behind Avila's house. Since a license plate number check indicated the vehicle was stolen, Detective Marino and his partner decided to place a tracking device on the car. As he was doing so, a Chevrolet Tahoe pulled up and parked. Avila, a female and a small child exited. Detective Marino asked Avila if the Audi was his. Avila said it was and became hostile. A key to the Audi was discovered in Avila's pocket. A letter addressed to Spencer Floyd was found in appellant's home. Floyd did not know of any mail missing from his car.

*Defense Testimony*

Avila's wife Sandy testified that she had been living with Avila in the house on Magnolia. She moved out of the house on September 23, 2013, and filed for divorce. On the morning of September 28, 2010, Avila came to her house and stayed there with their children. He then went with his brother to a recycling center. Avila and Sandy later reconciled and the divorce filing was dismissed. Sandy denied she was with Avila when he was driving the Tahoe.

In rebuttal, Detective Marino identified a photograph of Sandy as the female in the Tahoe.

Avila's stepmother, Carmen Lemus, testified that on the date of Avila's arrest, Sandy and her children were at her house from 10:00 a.m. until 3:00 or 3:30 p.m.

Jacquez did not present any evidence in his defense.

*DISCUSSION*

1. *Sufficiency of the Evidence*

   a. *Aggravated Mayhem (Avila only)*

Aggravated mayhem occurs when a person intentionally causes "permanent disability or disfigurement" of another "under circumstances manifesting extreme indifference to the physical or psychological well-being of another person." (§ 205.)

Avila contends that evidence of Waldrop's injuries was not sufficient to support the conviction of aggravated mayhem. He argues there was no permanent disfigurement, only superficial burns.

The evidence revealed that Avila repeatedly held a high-strength flame directly to vulnerable parts of Waldrop's body. Detective Darland did not take the photographs until one month after the attack and trial did not take place until almost 15 months later. In *People v. Keenan* (1991) 227 Cal.App.3d 26, the presence of scars three and one-half months after the attack were assumed to be permanent. (*Id*. at p. 36, fn. 6.) In addition, in *Keenan*, the injuries were inflicted with a lit cigarette, which was far less powerful than the gas torch used in this case. (*Id.* at p. 29.) We conclude there was sufficient evidence of permanent disfigurement.

Avila also claims there was no evidence to demonstrate the specific intent required for aggravated mayhem. Aggravated mayhem requires the specific intent to maim the victim. (*People v. Assad* (2010) 189 Cal.App.4th 187, 195.) Simple mayhem only requires general intent. (*People v. Park* (2003) 112 Cal.App.4th 51, 65.) The manner and circumstances of an attack can demonstrate specific intent. (*Id.* at p. 71.)

Here, contrary to Avila's characterization, this was not simply an indiscriminate or random attack. Avila specifically used the torch on Waldrop in order to extract information from him while Waldrop was bound and gagged. He was not using the torch in a random manner, but repeatedly and methodically applied the torch to specific areas of Waldrop's body for over an hour until Waldrop lost consciousness. The evidence shows this was a directed and controlled attack with focused or limited scope (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835-836) and an ongoing series of hostile acts

7

(*People v. Park, supra*, 112 Cal.App.4th at p. 71), which supports a finding that Avila intended to inflict a disabling injury.

   b.  *Receiving Stolen Property*

Avila contends there is insufficient evidence to support the conviction for receiving a stolen vehicle, count 9.  He argues that he was not a passenger in or driving the car.  He did not display any signs of guilt when asked about the car's ownership. Therefore, he contends, there is no basis to assume he exercised dominion or control over the car by simply having a key, nor was he aware the car was stolen.

In reviewing the evidence, we determine whether a rational trier of fact could find the essential elements were established beyond a reasonable doubt.  (*People v. Kraft* (2000) 23 Cal.4th 978; *People v. Mincey* (1992) 2 Cal.4th 408, 432.)

Section 496d, subdivision (a), the offense of receiving a stolen vehicle, requires a showing that the property in question was stolen, the defendant had knowledge the property was stolen and the defendant had actual or constructive possession of the property.

When apprehended, Avila was in the vicinity of the stolen car, not just loitering, but parked and walking towards it.  It was parked near his home.  He had a key in his pocket, so clearly had the means to use it.  He did not introduce any evidence that he had been sold the car or that someone had recently given him the key.  Mail in Floyd's name was found in his house.  The jury could easily have inferred that Avila had dominion and control over the car and knew it was stolen.  (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1577; *People v. Land* (1994) 30 Cal.App.4th 220, 228.)

   c.  *Credibility of Waldrop*

Avila contends that Waldrop's testimony was inherently implausible.  He cites evidence that Waldrop did not attempt to run away after the beating, but returned to Avila's house and did not seek medical attention or complain to police until he was arrested.  Avila also points to Waldrop's admission that he was using methamphetamine at the time the crimes were allegedly committed, Waldrop's failure to call Demott as a

8

witness, and Waldrop's admission that he had been punched by another drug dealer. He claims all of these factors make Waldrop's testimony suspicious.

First, we note that in this case, two sets of juries believed Waldrop. We may not substitute our judgment for that of the jury. It is not our function to assess the credibility of the witnesses. That is not the function of an appellate court. (*People v. Maury* (2003) 30 Cal.4th 342, 396; *People v. Barnes* (1986) 42 Cal.3d 284, 303.) We may not reverse the judgment merely because the evidence might also support a contrary finding. (*People v. Ceja* (1993) 4 Cal.4th 1134.)

Second, we observe that there was sufficient evidence to corroborate Waldrop's testimony. He sustained visible injuries as he had described, and the items used by his attackers were recovered from Avila's home. As to Jacquez, he confirmed most of the details of the attack, and his version differed only in the description of his participation in the incident. There was sufficient evidence to support the judgment.

## 2. Jury Instructions

### a. Unanimity

Avila contends the court did not orally instruct the jury with CALCRIM No. 3500 on unanimity. That instruction states: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act [he/she] committed."

This instruction was given with respect to count 7 after discussing it with counsel.[3] It was not requested as to the other offenses. Avila claims the court failed to give the instruction with respect to the remaining counts.

---

[3] The printed instruction read as follows: "The defendants are charged with Aggravated Mayhem in Count Seven. [¶] The People have presented evidence of more than one act to prove that the defendants committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

9

The jury must agree unanimously that a defendant is guilty of a specific crime. When the evidence suggests more than one discrete crime, the prosecution must elect among those crimes or the court must require the jury to agree on the same criminal act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The unanimity instruction is appropriate when conviction on a single count could be based on two or more discrete criminal events. The trial court has a sua sponte duty to give the instruction when warranted. (*Ibid*.)

The two assault counts (counts 2 and 5) were described to the jury by the prosecutor as weapon-specific, one with a mallet, one with a torch. There was no dispute that the torch was only used in the garage. However, there was evidence that Waldrop was hit by the mallet in the house and in the garage. Therefore, it unclear as to which specific use of the mallet constituted the assault charge.

As to the battery count (count 3), the prosecutor told the jury in closing: "the battery with serious bodily injury could go to multiple things. It could go to the fact that Mr. Avila attacked Mr. Waldrop with this mallet, the fact that Mr. Avila beat Mr. Waldrop unconscious, the fact that the Mapp gas was used against Mr. Waldrop." The prosecutor explained to the jury the torture count was based on Mr. Waldrop being "burned, beaten, knocked unconscious. It's great bodily injury. . . . The only reason that he was brought into that garage was to cause cruel or extreme pain. He was brought in there and he was tied up and he was gagged and he was beaten and he was burned." Given these statements, the juries could have based the battery and the torture verdicts on a number of acts by appellants.

Therefore, unanimity instructions should have been given with respect to the assault with the mallet, the battery and the torture counts because it was unclear as to whether the jury agreed as to the specific acts which constituted each crime.

However, when the jury resolves a basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. (*People v. Matute*

10

(2002) 103 Cal.App.4th 1437, 1449-1450; see *People v. Jones* (1990) 51 Cal.3d 294, 307, 321-322.)

There is a split of authority on whether the error must be harmless beyond a reasonable doubt or whether it is reasonably probable the defendant would have achieved a more favorable result had the instruction been given. (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647; *People v. Smith* (2005) 132 Cal.App.4th 1536, 1545.) Under either standard, we conclude the failure to give the instructions was harmless. Separate defenses were not offered as to each count. Avila's defense was that he was with his ex-wife on the date of the beatings. Jacquez admitted the attack took place and that he tried to help Waldrop by hitting Waldrop with his fists. Both defendants asserted in their defense that Waldrop was a methamphetamine user and gave inconsistent testimony.

By returning its guilty verdicts, the two juries unanimously demonstrated they believed Waldrop. There is no reasonable doubt, nor was it reasonably probable, that the juries would have reached a different result had they been instructed with CALCRIM No. 3500 as to the assault, battery and torture cases.

*b. Accomplice testimony*

Avila contends the court erred in failing to instruct the jury that Waldrop was an accomplice to the offense of receiving a stolen vehicle (count 9) and accordingly, the jury should have been instructed to view his testimony with caution.

Avila's contention is without merit. There was absolutely nothing which tied Waldrop to the theft of the Audi. Waldrop never testified that he had seen the Audi or stole the Audi. He was not with Avila when Avila was apprehended. The theft of the Audi was reported almost one month after the attack on Waldrop. Waldrop was apprehended in a stolen car one week before the Audi was stolen. There was no connection between the stolen car which Waldrop was driving and the Audi.

Avila attempts to argue that he, Waldrop, and Jacquez were involved in an ongoing enterprise of automobile theft and since Waldrop was part of that enterprise, he should be considered an accomplice. We agree that Waldrop admitted to stealing items out of cars at Avila's behest, but there is no evidence suggesting that Waldrop and Avila were involved in a joint operation to steal the Audi. No accomplice instruction was necessary as to count 9.

*3. Sentencing Issues*

*a. Abstract of Judgment (Jacquez)*

The abstract of judgment indicates Jacquez was convicted in count 7 of aggravated mayhem (§ 205) even though the jury returned a not guilty verdict on that count and a guilty verdict of mayhem (§ 203). Jacquez contends the abstract of judgment should be corrected and the People concede. We agree that this clerical error should be corrected.

*b. Custody Credits (Jacquez)*

Jacquez was arrested on January 7, 2011 and sentenced on February 17, 2012. Based on his counsel's representations he was awarded 468 days of presentence credit consisting of 407 days of actual custody credit and 61 days of conduct credit. He contends in his opening brief he was actually entitled to 408 days of actual custody credit and 61 days of conduct credit for a total of 469 day presentence credit. The People contend there was no error since the period of time, including the date of arrest and the date of sentencing, consists of 407 days. Jacquez concedes in his reply brief the credits were correctly calculated.

*c. Sentencing Issues (Jacquez)*

Jacquez was sentenced as follows:

On count 6 (torture): a life term with 7-year parole eligibility, doubled to 14 years;

On count 7 (mayhem): 8 years (4 years, doubled), but stayed pursuant to § 654;

On count 2 (assault with a mallet): 2 years (one-third the midterm, doubled) to run consecutively to the life term;

On count 3 (battery): 6 years (midterm, doubled), stayed pursuant to § 654;

12

On count 4 (false imprisonment): 16 months (one-third the midterm doubled), to run concurrently with count 2;

On count 5 (assault with the torch): 6 years (midterm, doubled), stayed pursuant to § 654;

On count 8 (dissuading a witness): 16 months (one-third the midterm, doubled) to run concurrently with counts 2 and 4.

In a letter dated January 31, 2013, we asked the parties to address at oral argument the trial court's apparent error in sentencing on counts 2, 4, and 8.

Section 1170.1, subdivision (a) provides that whenever a person is convicted of two or more felonies, the subordinate term for each consecutive sentence shall be one-third of the middle term prescribed for "each other felony conviction for which a consecutive term of imprisonment is imposed."

When an indeterminate term is imposed, as here, the limitations of section 1170.1 do not apply, and the consecutive sentences should be imposed as full terms. (*People v. Neely* (2009) 176 Cal.App.4th 787, 798.) Secondly, the one-third of the middle term rule only applies to consecutive sentences.

The court erroneously imposed one-third the middle term on counts 2, 4, and 8.

Count 2 was imposed consecutively to an indeterminate life term; the court should have imposed a full term.

Because counts 4 and 8 were imposed as concurrent terms, full terms should have been applied. The one-third the middle term formula the court utilized only applies to terms that run consecutively to the principal determinate term.

Because the trial court's sentencing error involves improper reductions to the aggregate sentence, rather than correct the sentence on appeal, we believe it advisable to permit the trial court to exercise its sentencing discretion on all counts. (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 509; *People v. Navarro* (2007) 40 Cal.4th 668, 681; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1209.) Remand will give the trial court an opportunity to restructure its sentencing choices in light of our conclusions. (*People v. Neely, supra,* 176 Cal.App.4th at p. 799.)

13

*d. Section 654 Issues as to Counts 2 and 4 (Jacquez)*

The court sentenced Jacquez to 14 years to life for count 6, torture, then stayed a consecutive term of eight years for count 7, mayhem (the midterm of 4 years, doubled for the strike allegation). It stated, "In my view, Penal Code section 654 applies to Count 7. As to count 6 and 7 there was but one criminal intent here, and that was to seriously, seriously injure Mr. Waldrop, to cause him extreme pain, to make him suffer, and to do so by causing a permanent disfigurement of his body in the most painful way possible. Once they got him to the garage there was an indivisible course of conduct that led from the entry of the garage to tying up Mr. Waldrop, getting the torch and burning one part of his body after another from his ear to his hand to his leg. Penal Code section 654 prohibits separate punishment for counts 6 and 7 under these circumstances."

The court then sentenced Jacquez to a consecutive 2-year term for count 2, the assault with the mallet. The court stated, "The crime involved separate acts of violence and threats of violence within the meaning of California Rules of Court, rule 4.425, therefore justifying a consecutive sentence."

Next, the court sentenced Jacquez to a 6-year term for count 3, the battery, but stayed that sentence pursuant to section 654.

In count 4, false imprisonment, the court sentenced him to a concurrent term of 16 months.

In count 5, the assault with a gas torch, the court sentenced him to 6 years but stayed it, stating, "as the torch was the implement used by the defendants to commit the torture in count 6 and mayhem in count 7, the court finds that additional punishment as to count 5 is also barred by Penal Code section 654." (RT 2127)~

In count 8, the dissuading of a witness, the court sentenced him to 16 months, to run concurrent with counts 2 and 4.

Jacquez contends the court should have stayed the sentence on count 4, the false imprisonment, because it was incident to the objective in the assault, mayhem and torture charges. He also contends that the sentence on count 2, the assault with a deadly weapon,

14

should have been stayed because the entire attack on Waldrop was to fulfill one objective.

Section 654 prohibits punishment for multiple crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) Whether a course of conduct is divisible depends on the intent and objective of the actor. If the acts had only one objective, the defendant may receive only one punishment. However, if the defendant had several, independent criminal objectives, he or she may be punished for each crime that was committed in pursuit of separate objectives, even where the crimes shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

Multiple punishments are appropriate where the defendant commits multiple offenses separated by periods of time during which reflection was possible. (*People v. Surdi* (1995) 35 Cal.App.4th 685, 689.) In *Surdi*, the defendant abducted the victim, stabbed him in a vehicle, and then after pausing to consider what to do, dragged him to a river bed and resumed attacking him. (*Id.* at pp. 687-688.)

The defendant's intent and objective are factual questions for the trial court. (*People v. Harrison, supra,* 48 Cal.3d at p. 335; *People v. Hutchins* (2001) 90 Cal.App.4th 1308.) On appeal we will sustain the court's implied factual determination if it is supported by substantial evidence. (*People v. Hutchins, supra,* 90 Cal.App.4th at p. 1312.)

Here, the facts support a conclusion appellants harbored multiple intents. The facts support an inference that they first intended to beat the victim due to the nature of the goods Waldrop had been bringing, but then moved him to the garage, away from Demott's room to determine if Demott was a snitch. The assault with the mallet and battery were separate not only in time and place but in objective. Before moving him into the garage, appellants could have stopped or released Waldrop. Under this theory, Jacquez was properly sentenced to a term of 14 years to life for the torture and the 2-year term for the assault with the mallet.

15

But the false imprisonment, count 4, the binding of Waldrop with cords in a chair, was the means by which they perpetrated the assault and mayhem, therefore that count should be stayed upon resentencing.

*DISPOSITION*

The judgment against Avila is affirmed. The judgment of conviction as to Jacquez is affirmed but the matter is remanded for resentencing in accordance with this opinion. A new abstract of judgment as to Jacquez should also reflect that he was convicted of mayhem (§ 203), not aggravated mayhem (§ 205).

**WOODS, Acting P.J.**

**We concur:**

**ZELON, J.**                                    **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.