Filed 3/28/22  P. v. Webb CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SCOTT WEBB,<br><br>    Defendant and Appellant. | H045312<br>(Santa Clara County<br>Super. Ct. No. C1642789) |

A jury convicted defendant Scott Webb of mayhem (Pen. Code, § 203),[1] and assault with a deadly weapon (§ 245, subd. (a)(1)) and found that he had personally used a deadly weapon while committing the offenses (§ 12022, subd. (b)(1)), and that he had personally inflicted great bodily injury in the commission of the assault with a deadly weapon (§§ 12022.7, subd. (a), 1203, subd. (e)(3)).  In a separate proceeding, the trial court found that Webb had suffered two prior strike convictions (§§ 667, subds. (b)-(i); 1170.12), and a prior serious felony conviction (§ 667, subd. (a)).

On appeal, Webb asserts the trial court erred by restricting his expert's testimony on witness identification, denying his motion to suppress the victim's in-court identification, limiting defense counsel's closing argument, refusing to give pinpoint jury instructions on witness identification and the definition of mayhem, and failing to instruct the jury on battery with serious bodily injury as a lesser included offense of simple

---

[1] All further statutory references are to the Penal Code.

mayhem. Webb also asserts there was not substantial evidence to support his conviction for mayhem, his New Mexico prior convictions do not qualify as strikes or serious felonies under California law, and the matter must be remanded for resentencing under Senate Bill No. 1393.

We agree that Webb is eligible for resentencing under Senate Bill No. 1393, and otherwise reject Webb's claims on appeal. We will remand the matter for the trial court to exercise its discretion to strike the five-year serious felony enhancement under section 667, subdivision (a)(1). (Sen. Bill No. 1393, ch. 1013, §§ 1, 2.)

## I. STATEMENT OF THE FACTS AND CASE

In April 2016, G. met a man in a parking lot near G.'s apartment in San Jose who said his name was "Scotty" (Webb). Webb had a white four-door car with New Mexico license plates. The two took Webb's car to G.'s apartment where they smoked methamphetamine. Webb told G. that he lived in his car and usually parked it in the VTA parking lot near G.'s apartment. Webb had an ex-wife and son who lived nearby.

Webb offered to give G. a massage, during which G. fell asleep. When G. woke up, his cell phone was missing, and Webb was gone. G. looked for Webb for about two weeks and found him on May 7, 2016, sitting in his car in the VTA parking lot. G. went to talk to Webb in his car, and Webb told him that he had taken G.'s phone by accident. Webb asked G. if there was anyone in his apartment and if G. had any drugs. The two went to G.'s apartment, and Webb asked him if he had a knife. G. and Webb started to smoke methamphetamine.

G. agreed to let Webb give him a massage. Webb got on top of G., who was lying face-down, and started to massage him. After a while, Webb told G. that he needed to heat up the massage oil. Webb went into the kitchen, and G. could hear the microwave running. Webb came back from the kitchen and poured the jar of oil on him. G. felt pain in his arm; when he looked back, he saw Webb had stabbed him. Webb grabbed G.

2

around his throat and cut G.'s forehead. Eventually, G. ran out of his apartment and to his neighbors' residence for help.

G. had eight stab wounds to his left arm and face, stab wounds to his left chest, back, right hand, and right ear, as well as damage to one of his lungs and a broken rib. Dr. Jonathan Lee was the plastic surgeon who repaired G.'s ear injury. Dr. Lee said that G.'s ear was almost completely transected, and the injury was severe and disfiguring.

While G. was at the hospital being treated for his injuries, he talked to a police officer. G. reported to the officer that he had been stabbed by a man named "Scotty." He told the officer that Scotty was in his 30s to 40s, six feet tall, white and had tattoos on his arms that went down to his elbows, as well as tattoos on his neck. G. also told the officer that Scotty slept in a white four-door car in the VTA parking lot near his apartment.

During the investigation, police showed G. photographs of men in an attempt to have G. identify his attacker. G. looked at two photo lineups without Webb's picture and did not identify any of the men as his attacker. Subsequently, G. looked at a photo lineup with Webb's picture and did not identify him as the attacker. Police showed G. two pictures of Webb from his Facebook page, and G. did not identify him. G. looked at another photo lineup that included Webb's picture and he did not identify Webb. G. first identified Webb as his attacker at the preliminary hearing held in October 2016, and later at the trial.

In G.'s apartment, police found two knives on the floor of G.'s bedroom. One of the knives was branded "Good Cook," was bent, and had blood on the blade. The other knife was branded "Forever Sharp." This knife was not damaged and did not have blood on the blade or handle. Only G.'s DNA was on the "Good Cook" knife, whereas Webb's DNA was found on the handle of the "Forever Sharp" knife.

Webb's former sister-in-law, R., said that her sister and Webb had a son, and in May 2016, Webb was homeless. R. said that her sister had been living very close to the VTA station where Webb slept in his car.

3

Webb was arrested on June 24, 2016, as he was walking toward the driver's side of a white four-door car with New Mexico license plates in south San Jose. Webb was six feet one inch tall, about 180 pounds, and had tattoos on his arms down to his elbows.

Webb was charged by information with aggravated mayhem—count 1 (§ 203), and assault with a deadly weapon—count 2 (§ 245, subd. (a)(1)). The information also alleged that Webb personally used a deadly weapon in the commission of both offenses (§ 12022, subd. (b)(1)). Regarding count 2, the information alleged that Webb personally inflicted great bodily injury. (§§ 12022.7, subd. (a), 1203, subd. (e)(3).) Finally, the information alleged that Webb had suffered two prior strike convictions and a conviction for a prior serious felony. (§§ 667, subd. (a), 667 subds. (b)-(i), 1170.12.)

Webb's case proceeded to jury trial. Webb's defense was that he did not commit the crimes, and G. had falsely identified him. Webb offered Dr. Kathy Pezdek as an expert in eyewitness identification. Over the objection of defense counsel, the trial court limited Dr. Pezdek's testimony to factors affecting the accuracy of eyewitness identification. Dr. Pezdek testified regarding various issues relevant to the accuracy of eyewitness identification. She stated that memory does not function "like a video camera" and decreases over time. She described certain factors affecting memory, including the amount of time someone is exposed to a person or event, lighting, and suggestions after the event. Dr. Pezdek indicated that if a person is initially unsure of an identification, but over time becomes more confident, the increase in certainty is an indication that "there was confirming feedback along the way." She stated that there is no relationship between a witness's confidence in his identification and the accuracy of the identification.

Following the presentation of evidence, the trial court granted Webb's section 1118.1 motion in part, finding there was insufficient evidence to support a conviction for aggravated mayhem (§ 205). The prosecutor amended the information to charge simple mayhem (§ 203) in count one, with the personal use of a knife (§ 12022, subd. (b)(1)).

4

Webb was found guilty as charged, and all of the additional allegations in the information were found true. In a bifurcated proceeding, the trial court found that Webb had been convicted of two prior strikes (§§ 667, subds. (b)-(i); 1170.12) based on evidence of his prior convictions from New Mexico for armed robbery and for aggravated battery with a deadly weapon. The court also found he had been convicted of a prior serious felony for the armed robbery (§ 667, subd. (a)) but found not true the allegation that Webb had been convicted of a serious felony for aggravated battery as it was not tried separately from the armed robbery conviction.

The trial court granted Webb's *Romero*[2] motion and dismissed one of his strike convictions. Webb was sentenced to state prison for an aggregate term of 22 years consisting of the following: eight years doubled to 16 years under section 667, subdivision (e) for the mayhem conviction in count 1 (§ 203), plus one year consecutive for the personal use of a deadly weapon in the commission of the crime (§ 12022, subd. (b)(1)), and five years to be served consecutive under section 667, subdivision (c). The court imposed four years doubled to eight years under section 667, subdivision (e) for the assault with a deadly weapon conviction in count 2 (§ 245, subd. (a)(1)), three years for inflicting great bodily injury (§ 12022.7, subd. (a)) and stayed one year for the personal use of a deadly weapon (§ 12022, subd. (b)(1)). The sentence imposed for count 2 was stayed pursuant to section 654.

Webb filed a timely notice of appeal.

## II. DISCUSSION

### A. Restriction of Defense Expert's Testimony on Witness Identification

Webb first asserts that the trial court abused its discretion by limiting the expert testimony of Dr. Pezdek regarding eyewitness identification more stringently than required by the California Supreme Court in *People v. McDonald* (1984) 37 Cal.3d 351

---

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

5

(*McDonald*) (overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914).  Specifically, he asserts that the trial court erred when it excluded the expert's testimony regarding the particular circumstances of G.'s identification of Webb as his attacker, and her opinion that G.'s identification was unreliable.  Webb argues the trial court's restriction of Dr. Pezdek's testimony violated his rights to due process, a fair trial, and his right to present a defense.  Applying the abuse of discretion standard elucidated in *McDonald*, we find no error.  (*Id*. at p. 355.)

Dr. Pezdek was permitted to testify about the various factors relevant to the accuracy of eyewitness testimony in general, including the witness's familiarity with the person identified, the amount of time the witness was exposed to the person, the witness's distance from the person and the lighting at the scene.  Dr. Pezdek also testified about the significance of same-race identification, post-event suggestion, and the inherent suggestiveness of in-court identification.  Over the objection of defense counsel, the trial court excluded Dr. Pezdek's opinion that G.'s failure to identify Webb as his attacker in the first photographic lineup signified that Webb was not the perpetrator.  Dr. Pezdek was also not permitted to opine that G. had a good look at the perpetrator because the two had been in close physical contact before the stabbing, the attack occurred in a well-lighted apartment, the photographic lineup that was shown to G. on June 22, 2016 could have suggestively influenced G., and G.'s identification of Webb at the preliminary hearing and at trial was unreliable.

In *McDonald*, the California Supreme Court concluded that the trial court erred when it excluded the defense expert's testimony concerning the psychological factors that can affect eyewitness identification.  (*McDonald*, *supra*, 37 Cal.3d at p. 369.)  Six eyewitnesses identified the defendant as the perpetrator, and one witness unequivocally said that the defendant was not the perpetrator.  The defendant produced six alibi witnesses who said he was out of the state when the crime occurred.  (*Id.* at pp. 355-360.)  The defendant wanted to introduce testimony from an expert on eyewitness

6

identification; however, the trial court ruled that the proposed testimony was inadmissible.  (*Id.* at pp. 361-363.)

In finding that the trial court erred when it excluded the expert testimony offered by the defendant, the Supreme Court reasoned that in certain cases, expert testimony regarding the accuracy of eyewitness identification could be helpful because that information might be beyond the common experience of jurors.  (*McDonald*, *supra*, 37 Cal.3d at pp. 361-363.)  The court noted that the accuracy of the eyewitnesses' testimony was critical to the prosecution and the proposed expert testimony could have assisted the jury in resolving the uncertainty of the identifications.  In addition, the veracity of the eyewitness testimony was the basis of the defense.  (*Id.* at pp. 373-376.)  The court found the trial court's exclusion of the testimony was prejudicial to the defendant because there was no other direct or circumstantial evidence linking the defendant to the crime, there were weaknesses in the eyewitnesses' testimony that the expert could have exposed, and there were witnesses who provided the defendant an alibi.  (*Id.* at p. 376.)

Webb relies on language in *McDonald* that "[t]he expert testimony in question does *not* seek to take over the jury's task of judging credibility: as explained above, it does not tell the jury that any particular witness is or is not truthful or accurate in his identification of the defendant.  Rather, it informs the jury of certain factors that may affect such an identification in a typical case; and to the extent that it may refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness." (*McDonald, supra*, 37 Cal.3d at pp. 370-371.)  From this he argues the trial court abused its discretion when it would not allow the testimony of the expert applying the factors affecting the accuracy of eyewitness identification to the particular circumstances of G.'s identification of Webb, asserting that "*McDonald* only purports to prevent eyewitness experts from testifying 'that any

7

particular witness is or is not truthful or accurate in his identification of the defendant.' *McDonald*, 37 Cal.3d at 370."

While we agree that *McDonald* does permit the admission of opinion evidence referencing the particular circumstances of an identification, it does not compel the introduction of such evidence or persuade us that the trial court erred by excluding the expert's testimony here. The *McDonald* court noted that the trial court has broad discretion to admit or exclude expert testimony on witness identification, stating: " '[W]e do not intend to "open the gates" to a flood of expert evidence on the subject.' " (*McDonald, supra,* 37 Cal.3d at p. 377.) The court further stated that "such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." (*Ibid.,* fn. omitted.)

In *People v. Sanders* (1995) 11 Cal.4th 475, 509 (*Sanders*), the Supreme Court reaffirmed *McDonald* but found its facts distinguishable. Concluding that the trial court had properly exercised its discretion to exclude the eyewitness identification expert testimony, the court noted that there was incriminating circumstantial evidence corroborating the eyewitnesses' identifications, and that the eyewitnesses' testimony in *Sanders* was not the only evidence that the defendant had committed the crime. (*Sanders, supra,* 11 Cal.4th at pp. 509-510.) The *Sanders* court further opined that if the trial court did err in excluding the expert testimony, the error was harmless because the eyewitnesses were cross-examined about the accuracy and reliability of their identifications, defense counsel emphasized the factors that tended to undermine the accuracy and reliability of the identifications in closing argument, the identifications were corroborated, and the defendant offered no alibi. (*Id.* at p. 510.)

Finding this case similar to *Sanders*, we conclude that the trial court did not abuse its discretion here. Further, the exclusion of a portion of Dr. Pezdek's proffered testimony did not violate Webb's rights to due process or to present a defense. The trial court did not wholly preclude Dr. Pezdek's testimony as the trial court did in *McDonald*,

8

but allowed the expert to describe various factors that could influence the accuracy of witness identification. Dr. Pezdek thus provided general information about eyewitness identification that could have been beyond the jury's common experience. (See *McDonald*, *supra*, 37 Cal.3d at p. 369.) With the framework to critique the limitations of eyewitness testimony that Dr. Pezdek provided, the jury was able to assess the accuracy of G.'s identification of Webb. Defense counsel vigorously cross-examined G. about his observation of his attacker and his ultimate identification of Webb as that person. This cross-examination provided the jury with the opportunity to assess G.'s credibility, informed as well by Dr. Pezdek's testimony. Defense counsel also argued extensively during closing argument that G.'s identification of Webb was the result of post-event suggestibility. On this record, we determine that the court did not preclude Webb from presenting and arguing his defense of mistaken identification.

Even assuming the trial court did err in excluding portions of Dr. Pezdek's testimony, we find the error would be harmless. As in *Sanders*, here, there was incriminating evidence that Webb committed the attack. This evidence corroborated G.'s identification of Webb and gave it independent reliability. (See *Sanders*, *supra,* 11 Cal.4th at pp. 509-510.) Specifically, G. described his attacker to the police as a person named "Scotty," who was a white male around six feet tall, with tattoos on his arms that went only to his elbows. G. also told police that the attacker drove a four-door white car with New Mexico license plates and had an ex-wife and son who lived not far from G. This information was consistent with Webb's name, his physical appearance, his tattoos, the car he drove, and the location of Webb's family members. While Webb's DNA was not found on the bloody and bent knife found in G.'s bedroom, his DNA was located on a knife found on the bedroom floor adjacent to it, thus further corroborating G.'s testimony that Webb was in his apartment. As in *Sanders*, Webb presented no alibi defense. Given the additional evidence presented at trial indicating that Webb was the perpetrator of the attack on G., we find it is not reasonably probable that Webb would have received a more

9

favorable verdict had the expert testimony not been limited. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*).)

### B. *Motion to Suppress Victim's In-Court Identification*

Webb next asserts the trial court erred when it denied his motion to exclude G.'s in-court identification of him. He argues the identification was tainted because the police showed G. impermissibly suggestive photographic lineups and single images of Webb during the investigation.

An identification procedure is unfair if it "suggests in advance of identification by the witness the identity of the person suspected by the police." (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.) Admission of eyewitness identification evidence may violate a defendant's constitutional due process rights if the identification procedures were "unnecessarily suggestive and conducive to irreparable mistaken identification . . . ." (*Stovall v. Denno* (1967) 388 U.S. 293, 302.)

In *People v. Holmes*, *McClain and Newborn* (2022) 12 Cal.5th 719, 746 the California Supreme Court reiterated the test from *People v. Cunningham* (2001) 25 Cal.4th 926 (*Cunningham*), to determine if the admission of identification evidence violates due process. " '[W]e consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citations.]" Citing *People v. Lemcke* (2021) 11 Cal.5th 644, 665 the Supreme Court noted: "[t]here is [now] near unanimity in the empirical research that " ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (*Holmes,* at p. 746.)

10

In determining whether an identification procedure is unduly suggestive, "[t]he question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him [or her]." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176.) "The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*Cunningham, supra*, 25 Cal.4th at p. 989.) Whether an identification procedure is "unduly suggestive" for due process purposes is a mixed question of law and fact that we review de novo. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.) If the defendant fails to meet his or her initial burden of demonstrating that the identification procedure was unduly suggestive, we "need not reach the question 'whether the identification was nevertheless reliable under the totality of circumstances.' [Citations and fn. omitted.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1164.)

Here, G. participated in a number of identification procedures with detectives during the investigation. In May 2016, G. looked at two different photo lineups that did not include Webb's picture, and he did not identify any of the men as his attacker. In June 2016, G. looked at a photo lineup that included Webb's picture, and he did not identify Webb as his attacker. G. was then shown two pictures of Webb from Webb's Facebook page and did not identify him. G. looked at another photo lineup that included Webb's picture and did not identify him as the attacker. Later on the same day, G. was shown pictures of Webb's tattoos and could not positively identify them. The day after looking at the pictures of the tattoos, G. called Detective Palmer to say that he had changed his mind about the tattoos and thought the man in the pictures might be his attacker. G. positively identified Webb as his attacker at the preliminary hearing held in October 2016, and later at the trial.

Webb asserts the identification procedures were unduly suggestive because G. was shown photo displays that included Webb's face several times before the in-court identification, was shown individual photographs of Webb and his tattoos during the

11

investigation and saw Webb in jail clothing and shackles in a court proceeding prior to the preliminary examination where G. first positively identified Webb. He asserts that when law enforcement shows a single person photo of a suspect to a crime victim, the individual in the photo is inevitably highlighted as the likely perpetrator of the offense. Apart from the seriatim displays of the images that Webb alleges impermissibly influenced G's in-court identification, Webb does not identify any statements or actions of the detectives showing the various images that suggested a positive identification of Webb.

We do not find support in case authorities for Webb's assertion that the in-court identification was impermissibly tainted by his prior exposure to images. In *People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*), the California Supreme Court held that the use of a single-person photographic identification is not inherently unfair or impermissibly suggestive. In addition, "[s]howing the witnesses a single photo of the defendant is no more *impermissibly* suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom." (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009.) "A single person photograph is analogous to a single person showup that 'may pose a danger of suggestiveness, but such lineups or showups are not necessarily or inherently unfair.' " (*People v. Chavez* (2018) 22 Cal.App.5th 663, 674.) A single person showup procedure is considered unfair when it is not neutral and unnecessarily suggests to the witness in advance the identity of the person suspected by the police. (*People v. Yeoman* (2003) 31 Cal.4th 93, 123-124; *Ochoa*, at pp. 412-413.) There is no due process violation if the challenged identification procedure is not impermissibly suggestive. (*Ochoa*, at p. 412.)

We conclude the detective's presentation of single pictures of Webb and his tattoos in this case was not unduly suggestive. Before showing G. the individual images of Webb, G. viewed two different photo lineups that did not include Webb and made no identification of his assailant. After he was shown the Facebook page images of Webb,

12

G. was shown a lineup that included Webb, and made no identification of his assailant. We do not agree that it follows that G. identified Webb at the preliminary examination because he had previously seen photos of Webb. Further, there is nothing in the record demonstrating that law enforcement did more than present the arrays of photos and the individual images of Webb in a neutral way to G. Although G. saw a cumulation of photos over time, there is no evidence that the police accompanied any of the photo lineups or individual photos with statements or actions that indicated that Webb was G.'s assailant. Nor do we perceive any constitutional violation simply because law enforcement presents various photos at different times to a victim. We agree with the trial court that Webb did not meet his burden of showing "any of the prior identification[s] to be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

However, even assuming the procedures were unduly suggestive, G.'s in-court identification of Webb was reliable under the totality of circumstances. (*Cunningham*, *supra*, 25 Cal.4th at p. 989.) Although the in-court identification occurred six months after the attack, and was not fresh in time, the remaining factors as set forth in *Cunningham* support a finding of reliability of that identification. Specifically, G. had a significant opportunity to view Webb's face when he saw him in the parking lot and when the two were in G.'s apartment immediately prior to the attack. G. said that he saw the attacker's face just prior to being stabbed. After the attack, G. described the attacker to the police as a white male who was about six feet tall, named "Scotty" with tattoos on his arms and very rough hands. G. said that his attacker had an ex-wife and a son who lived near his apartment, and he drove a white four-door car with New Mexico license plates. These facts were consistent with Webb's characteristics.

We thus conclude the trial court did not err in denying Webb's motion to suppress G.'s in-court identification. But even if the court did err, we find the error would be harmless. As stated in Section A., *ante*, given the additional evidence presented at trial

13

that Webb was G.'s assailant, it is not reasonably probable that Webb would have received a more favorable verdict had the trial court granted Webb's motion to suppress the in-court identification. (*Watson, supra*, 46 Cal.2d at pp. 836-837.)

### C.  Limitation of Defense Counsel's Closing Argument

Webb argues the trial court's denial of defense counsel's request to argue to the jury in closing that Webb did not confess to the crimes of which he was being charged was prejudicial per se and requires reversal. When it ruled that defense counsel could not argue that Webb did not confess to the attack on G., the trial court stated: "If there was an interview and Mr. Webb did not confess in that interview, then that would be the state of the evidence that the Defense could properly argue. The context of the situation, however, is that there was an invocation of Mr. Webb's Fifth Amendment right as he is entitled to do so. And the officer respected that invocation, as the officer was required to. Therefore, there was no opportunity for the officer to talk further. Under those circumstances, the Court believes that the argument that there was no confession would not be appropriate. The Defense is not precluded from arguing the lack of evidence in this case. The ruling is only limited to pinpointing, among the lack of evidence, pinpointing to the lack of a confession. So that will be the Court's ruling."

Webb cites *In re William F.* (1974) 11 Cal.3d 249, 253-256 (*William F.*), for the proposition that a court's limitation of closing argument is a violation of his constitutional right to the assistance of counsel, due process, and to present a defense, and is therefore prejudicial per se. In *William F.*, the juvenile court precluded counsel for the minor from presenting a closing argument at the conclusion of the jurisdictional hearing. (*Id.* at p. 253.) The California Supreme Court found that the juvenile court's refusal to allow the minor's counsel to present closing argument violated the minor's constitutional rights, was prejudicial per se, and reversed the judgment. (*Id.* at p. 255.) But we conclude that Webb's reliance on *William F.* is misplaced, because here, unlike in *William F.*, the trial court did not preclude defense counsel from presenting any closing

14

argument at all and did not prevent counsel from arguing about evidence presented at trial that was relevant to the defense theory of mistaken identity. We see no basis for finding a constitutional violation that resulted in per se prejudice.

We are also persuaded that the trial court has the responsibility to exercise its discretion to prevent improper argument by the parties, including attempts to present factually unsubstantiated contentions to a jury. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1387-1389.) In exercising its discretion under section 1044, which allows the court to control the process of a criminal trial, the court must be impartial and must assure that a defendant is afforded a fair trial. When there is no patent abuse of discretion, a trial court's determinations under section 1044 must be upheld on appeal. (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1334.)

We determine the trial court did not abuse its discretion in prohibiting defense counsel from arguing that Webb did not confess to the crimes. Webb asserted his right against self-incrimination under the Fifth Amendment when the police attempted to interview him, and as required by law, the police terminated their interview of him. The fact that an abbreviated police interview took place was not in evidence. We agree with the attorney general that defense counsel's argument that Webb did not confess would have improperly referenced the fact of the police interview which was not before the jury.

However, assuming the trial court's limitation of defense counsel's closing argument was an abuse of discretion, we find the error would be harmless for the reasons stated in Section A., *ante*. and conclude it is not reasonably probable that Webb would have received a more favorable verdict had defense counsel been permitted to argue to the jury that Webb did not confess to the crimes. (*Watson, supra*, 46 Cal.2d at pp. 836-837.)

### D. *Pinpoint Instruction on Witness Identification*

Webb next contends that the trial court erred when it denied Webb's request to provide a pinpoint jury instruction on witness identification. The proposed instruction

read:  "You are instructed that the identity of the Defendant as the person who committed the crime is an element of every crime.  Therefore, the burden is on the State to prove beyond a reasonable doubt not only that the crime alleged was committed, but also that the Defendant was the one who committed it.  You must be satisfied beyond a reasonable doubt of the accuracy of the witness'[s] identification of the Defendant.  In this regard, you are instructed that it is not necessary for the Defendant to prove that another person may have committed the crime nor is it the burden of the Defendant to prove his innocence.  If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the Defendant was the person who committed the crime charged, then you should find the Defendant not guilty of that offense."

The trial court must instruct the jury on general principles " ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case" ' " including those instructions that "pinpoint" a defense theory.  (*People v. Hovarter* (2008) 44 Cal.4th 983 (*Hovarter*).)  Pinpoint instructions are not warranted, however, when they are argumentative, such as when requested only to highlight particular evidence.  (*People v. Hughes* (2002) 27 Cal.4th 287, 361.)  The court may decline to give a pinpoint instruction if the proposed instruction is duplicative of other instructions given.  (*Hovarter*, at p. 1021.)

Here, in refusing to give Webb's proposed pinpoint instruction, the trial court found that it was argumentative and duplicative of CALCRIM Nos. 315[3] and 105[4], which adequately instructed the jury about what factors to consider in evaluating the strength of a witness's identification of a suspect, and the reliability of a witness's testimony at trial. We agree. Although it would have been within the trial court's discretion to give the proffered pinpoint instruction, CALCRIM Nos. 315 and 105, coupled with CALCRIM

[3] The CALCRIM No. 315 instruction given in this case states: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? How closely was the witness paying attention? Was the witness under stress when he or she made the observation? Did the witness give a description and how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant? Did the witness ever change his or her mind about the identification? How certain was the witness when he or she made an identification? Are the witness and the defendant of different races? Was the witness able to identify the defendant in a photographic or physical lineup? Were there any other circumstances affecting the witness's ability to make an accurate identification? The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

[4] The CALCRIM No. 105 instruction given in this case states: "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: How well could the witness see, hear, or otherwise perceive the things about which the witness testified? How well was the witness able to remember and describe what happened? What was the witness's behavior while testifying? Did the witness understand the questions and answer them directly? Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest is how the case is decided? What was the witness's attitude about the case or about testifying? Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? How reasonable is the testimony when you consider all the other evidence in the case? Did other evidence prove or disprove any fact about which the witness testified?"

No. 103, which defines the standard for reasonable doubt, informed the jury that the prosecution was required to prove that Webb was the person who committed the crimes in this case. The given instructions also informed the jury of all of the applicable considerations when evaluating a witness's trial testimony and identification of a suspect. The content of the pinpoint instruction was adequately conveyed to the jury through CALCRIM Nos. 103, 105 and 315, and as a result, the trial court acted within the bounds of its discretion when it concluded the instruction would have been duplicative. The trial court did not err in denying Webb's request to give the pinpoint instruction on witness identification. (See *Hovarter*, *supra*, 44 Cal.4th at p. 1021.)

### E. Instruction on Battery with Serious Bodily Injury as a Lesser Included Offense of Simple Mayhem

Webb asserts the trial court had a sua sponte duty to instruct the jury on battery with serious bodily injury[5] as a lesser included offense of simple mayhem.

A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, " 'that is, evidence that a reasonable jury could find persuasive' " [citation], which, if accepted, " 'would absolve [the] defendant from guilt of the greater offense' [citation] *but not the lesser*." ' " (*People v. Licas* (2007) 41 Cal.4th 362, 366 (*Licas*).) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*Id.* at p. 366; see *People v. Hicks* (2017) 4 Cal.5th 203, 208-209 (*Hicks*).) "If a lesser offense shares some common elements with the greater offense, or if it arises out of the same criminal course of

---

[5] Battery with serious bodily injury is battery that causes "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4).)

conduct as the greater offense, but it has one or more elements that are not elements of the greater offense as alleged, then it is a lesser related offense, not a necessarily included offense." (*Hicks*, at p. 209.) " 'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense.' " (*Licas*, at p. 366.)

Here, the trial court granted Webb's section 1118.1 motion, finding there was insufficient evidence presented at trial to support a conviction of aggravated mayhem (§ 205), as charged in count 1. However, the trial court commented that there was "sufficient evidence for [simple] mayhem or battery with serious bodily injury." In response, the prosecutor moved to amend the information to allege simple mayhem in count 1, which is defined in section 203 as follows: "[e]very person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

Applying the principles described above under the de novo standard, we determine that the trial court had no sua sponte duty instruct the jury on battery with serious bodily injury as a lesser included offense to simply mayhem. Although courts have described the terms "serious bodily injury" and "great bodily injury" as the same in certain contexts, "the terms in fact 'have separate and distinct statutory definitions.' [Citation.] This distinction may make a difference when evaluating jury instructions that provide different definitions for the two terms." (*People v. Santana* (2013) 56 Cal.4th 999, 1008-1009; see *People v. Poisson* (2016) 246 Cal.App.4th 121, 125 [citing *Santana* and rejecting the proposition that the terms great bodily injury and serious bodily injury should be used "interchangeably"].) While great bodily injury is an element of mayhem (*People v. Brown* (2001) 91 Cal.App.4th 256, 272.), serious bodily injury is not. (*Santana,* at p. 1007.) Therefore, battery with serious bodily injury is not a lesser included offense to mayhem, and the trial court had no duty to provide the jury with any

instruction related to that crime. The trial court had no sua sponte duty to instruct the jury on battery with serious bodily injury.

### F. Substantial Evidence to Support Mayhem Conviction

Webb asserts there is not sufficient evidence to support his mayhem conviction because G.'s injuries do not fit within the definition of the crime as originally drafted in the Coventry Act of 1670.

When a defendant challenges the sufficiency of evidence on appeal, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] A reviewing court must reverse a conviction where the record provides no discernible support for the verdict even when viewed in the light most favorable to the judgment below. [Citation.] Nonetheless, it is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt. [Citation.] And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment." (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

Penal Code section 203 defines simple mayhem as follows: 'Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." Webb's argument rests on the proposition that the injury to G.'s ear does not qualify as a "slit" within the definition of the word in the 1670s when the crime of mayhem was first codified. Webb cites *A Copious Dictionary in Three Parts* (1674), by Francis Gouldman, for the definition of "slit" as "to cleave or rive," meaning to "cut into pieces." Webb asserts that the definition of "slit" extant when

20

the crime of mayhem was first drafted should apply to this case. Since G.'s ear was not completely severed from his head, or cut into pieces, Webb argues his injury is not a "slit," and he cannot be convicted of the crime of mayhem.

In *Santana*, *supra*, the California Supreme Court considered the evolution of the mayhem statute from its inception. The court stated: "[t]hough section 203 contains 'verbal vestiges' of the common law and the Coventry Act of 1670, ' "the modern rationale of the crime may be said to be the preservation of the natural completeness and normal appearance of the human face and body, and not, as originally, the preservation of the sovereign's right to the effective military assistance of his subjects." ' (*People v. Newble* (1981) 120 Cal.App.3d 444, 451, 174 Cal.Rptr. 637; see [*People v.*] *Keenan* [(1991)] 227 Cal.App.3d [26], 34, 277 Cal.Rptr. 687 [describing cases that 'have expanded mayhem to include acts not within the original definition of the crime'].) In other words, section 203 'protects the integrity of the victim's person.' (*People v. Page* (1980) 104 Cal.App.3d 569, 578, 163 Cal.Rptr. 839 (*Page*); see *People v. Green* (1976) 59 Cal.App.3d 1, 3, 130 Cal.Rptr. 318; see also *Keenan, supra,* 227 Cal.App.3d at p. 34, 277 Cal.Rptr. 687 [recognizing cases as 'practical and proper applications of an old statute to modern-day reality'].)" (*Santana*, *supra*, 56 Cal.4th at p. 1004.)

Consistent with the court's reasoning in *Santana*, we conclude that the original definition of "slit" from 1670, which would require the assailant to cut the victim's ear from the head or into pieces to commit the crime of mayhem, is too limited to capture the meaning of the offense of mayhem today. The noun "slit" is currently defined in the Merriam-Webster dictionary as "a long narrow opening."[6] The verb "slit" means to a: to

---

[6] Definition of *slit*, noun, Merriam-Webster Dictionary https://www.merriam-webster.com/dictionary/slit [as of March 25, 2022], archived at <https://perma.cc/C8MS-M2U6>.

21

make a slit in; b: to cut off or away: SEVER; c: to form into a slit."[7] These modern definitions more accurately reflect the *Santana* court's statement that section 203 is designed to protect " 'the integrity of the victim's person,' " and the normal appearance and completeness of the person's appearance. (*Santana*, *supra*, 56 Cal.4th at p. 1004.) We thus find their use appropriate.

Applying the modern meaning of the word "slit," we find there is substantial evidence supporting Webb's conviction for mayhem. When Webb attacked G. with the knife, G.'s ear was almost completely transected and required surgical repair to reattach it. According to the surgeon who treated him, G. sustained a "very disfiguring injury." There is no question that that G.'s ear was "slit" within the modern meaning of the word. Reversal of Webb's conviction is not warranted because his conduct "did not fall within the ancient definition of mayhem." (*Keenan, supra*, 227 Cal.App.3d at p. 34.) Sufficient evidence supports Webb's conviction for mayhem under section 203.

### G. Pinpoint Instruction on Mayhem

Webb argues the trial court had a sua sponte duty to give a pinpoint instruction on the legal definition of the word "slit," because, according to Webb, it is not a word that is commonly understood. Webb suggests that the court should have instructed the jury that the word "slit" means to "cleave" or "rive" or "cut off or away" the ear.

The trial court has a sua sponte duty to instruct, including giving, amplifying or clarifying instructions where the term used in an instruction has a " 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation]." (*People v. Chaffin* (2009) 173 Cal.App.4th 1348, 1351.) There is no duty to give a clarifying instruction if the term in the instruction has a plain and

---

[7] Definition of *slit*, verb, Merriam-Webster Dictionary https://www.merriam-webster.com/dictionary/slit [as of March 25, 2022], archived at <https://perma.cc/GX39-RDTL>.

unambiguous meaning that is " 'commonly understood by those familiar with the English language . . . .' " (*People v. Kimbrel* (1981) 120 Cal.App.3d 869, 872.)

Here, the trial court properly instructed the jury on the crime of mayhem using CALCRIM No. 801 as follows: "The defendant is charged in Count 1 with mayhem in violation of Penal Code section 203. [¶] To prove that the defendant is guilty of mayhem, the People must prove that the defendant unlawfully and maliciously: [¶] Slit someone's ear. [¶] Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injury someone else. [¶] A disfiguring injury may be permanent even if it can be repaired by medical procedures."

As discussed in Section F., *ante*, we reject Webb's contention that the definition of "slit" from 1670 should apply to the contemporary crime of mayhem. We determine that the trial court had no sua sponte duty to instruct on a specialized definition of "slit," as the word is commonly understood and needs no additional explanation.

### H. Cumulative Error

Webb argues that the cumulative impact of the errors discussed above rendered the trial fundamentally unfair. As we have rejected each of Webb's individual challenges, we find no basis for Webb's separate claim of cumulative error. (*People v. Watkins* (2012) 55 Cal.4th 999, 1036.)

### I. New Mexico Prior Convictions as Strikes

The trial court found Webb had been convicted of armed robbery and aggravated battery with a deadly weapon in New Mexico, and that these convictions qualified as both strike offenses (§§ 667, subds. (b)-(i); 1170.12), and prior serious felony convictions (§ 667, subd. (a)), that could be used to enhance Webb's sentence. Webb contends that there was insufficient evidence to sustain the sentence enhancements under section 667.

An out-of-state or foreign conviction may be found to be a strike offense in California if the conviction "is for an offense that includes all of the elements of a

23

particular felony as defined in subdivision (c) of [s]ection 667.5 or subdivision (c) of [s]ection 1192.7." (§ 667, subd. (d)(2); see also § 1170.12, subd. (b)(2).) Thus, "[a] defendant whose prior conviction was suffered in another jurisdiction is . . . subject to the same punishment as a person previously convicted of an offense involving the same conduct in California." (*People v. Myers* (1993) 5 Cal.4th 1193, 1201 (*Myers*).)

To determine whether a prior conviction from another state contains all of the elements of the California felony, the trier of fact may not look outside the record of conviction. The court may consider any evidence in the record of conviction "if not precluded by the rules of evidence or other statutory limitation." (*Myers, supra,* 5 Cal.4th at p. 1201.) If the record does not disclose any of the facts of the offense actually committed, the court will presume the prior conviction was for the least offense punishable under the law of that jurisdiction. (*People v. Guerrero* (1988) 44 Cal.3d 343, 355.)

### 1. Armed Robbery

The prosecution provided the record of conviction of the New Mexico priors. These documents included the April 9, 2009 criminal information, the judgment, the plea and disposition form, and two copies of CLETS printouts containing Webb's criminal record. The April 9, 2009 criminal information alleged in Count 1 that Webb committed the crime of armed robbery as follows: "[O]n or about February 20, 2009, the above-named defendant took papers and currency from Pete Casen by the use of force or threats of force while armed with a knife, a second degree felony, contrary to Section 30-28-2 and Section 30-16-2, NMSA 1978." In Count 2 it alleged that he committed "Aggravated Battery (Deadly Weapon) . . . did touch or apply force to the person of Pete Casen with a deadly weapon to wit; a knife . . . contrary to Section 30-3-5, NMSA, 1978." In Count 3 Webb was charge with tampering and interference with communications. The June 12, 2009 plea and disposition agreement stated that Webb pleaded in count 1 to "[a]rmed [r]obbery, § 30-28-2 and § 30-16-2, NMSA 1978, a

24

second degree felony." The plea agreement indicated that "[T]his agreement, unless rejected or withdrawn, serves to amend the . . . information to charge the offense to which the defendant pleads, without the filing of any additional pleading." The August 3, 2009 judgment provided that Webb "was convicted on June 11, 2009, pursuant to a no contest plea accepted by the court of the offense[] of Armed Robbery, a second degree felony, contrary to § 30-16-02, NMSA 1978, occurring on or about February 20, 2009, as charged in Count 1 of the Criminal Information[.]"

The parties disagree regarding what facts the record of conviction proves, and what can lawfully be inferred from the record. Webb asserts that although he was charged in the April 9, 2009 information with robbery "while armed with a knife," that information was amended by the terms of the June 12, 2009 plea agreement. As a result, Webb argues that he pled to armed robbery without admitting that he possessed or used a knife. Webb contends that as defined in New Mexico law, armed robbery without proof or an admission of use of a knife does not share the same elements as robbery in California, and thus the trial court erred in finding the New Mexico robbery prior to be a serious felony or a strike offense.

The crime of armed robbery in New Mexico is defined as taking "anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence. [¶] Whoever commits a robbery is guilty of a third degree felony. [¶] Whoever commits robbery while armed with a deadly weapon is, for the first offense, guilty of a second degree felony and, for second and subsequent offenses, is guilty of a first degree felony." (N.M. Stat. Ann. § 30-16-2.)

Robbery in California is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; see *People v. Clark* (2011) 52 Cal.4th 856, 944 (*Clark*).) The elements of robbery are (1) the defendant took property that was not his or hers; (2) the property was taken from another person's possession and

immediate presence; (3) the property was taken against the person's will; (4) the defendant used force or fear to take the property or to prevent the person from resisting; and (5) when the defendant used force or fear to take the property, the defendant intended to remove it from the owner's possession for such an extended period of time the owner would be deprived of a major portion of the value of the property. (*Clark,* at p. 943.)

Webb argues his robbery conviction from New Mexico does not qualify as a strike in California unless it can be proved to have committed while armed with a knife, because the force required to commit a robbery in New Mexico differs from that required in California. In California, "it is established that something more is required than just the quantum of force which is necessary to accomplish the mere seizing of the property." (*People v. Morales* (1975) 49 Cal.App.3d 134, 139.) Thus "[g]rabbing or snatching property from the hand has often been held to be grand larceny, and not robbery." (*People v. Church* (1897) 116 Cal. 300, 303; citing *State v. Clokey*, 553 P.2d 1260 (N.M. 1976)), Webb asserts that a lesser amount of force is sufficient to support a robbery in New Mexico, such that even if no resistance is offered by the victim of a purse snatch, the force accompanying the snatching of the purse is sufficient to support a robbery conviction.

We need not determine whether armed robbery as described in New Mexico is the equivalent of robbery as defined under California law because we conclude that the record demonstrates that Webb was armed with a knife when he committed the robbery. Although Webb pled no contest to armed robbery as charged in the information, and the information alleged that he took property "by the use of force or threats of force while armed with a knife," Webb argues the trial court could not infer that he pled to armed robbery while armed with a knife. He points to the language in the plea form that states: "this agreement, unless rejected or withdrawn, *serves to amend the complaint, indictment, or information to charge the offense to which the defendant pleads*, without the filing of any additional pleading." (Emphasis added.) He asserts the judgment stating that Webb

26

"was convicted on June 11, 2009, pursuant to a no contest plea accepted and recorded by the Court, of the offenses of Armed Robbery, a second degree felony . . . as charged in Count 1 of the Criminal Information; [and] Aggravated Battery (Deadly Weapon), a third degree felony . . . as charged in Count 2 of the Criminal Information," did not refer back to the original criminal information filed on April 1, 2009, but reflected instead the "amended" information that allowed Webb to plead to armed robbery and aggravated battery (deadly weapon) without reference to the specific information that Webb was armed with a knife.

We do not agree. The reference to amending the information in the plea form addressed the fact that the remaining charges from the information, which were tampering with evidence and interference with communications, were dismissed. Webb pleaded to armed robbery and aggravated battery (deadly weapon), which are the same two charges alleged in counts 1 and 2 in the information. It is reasonable to infer that the allegations from the information were incorporated in the plea because the judgment states that Webb pleaded guilty to armed robbery "as charged in Count 1 of the Criminal Information." The plea in this case thus included the allegation that Webb stole papers and currency from the victim by use of force or threats of force while armed with a knife.

Webb cites *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*), for the proposition that the trial court was prevented from considering the criminal information in this case to conclude that he was armed with a knife when he committed the robbery. In *Gallardo*, the trial court reviewed the preliminary hearing testimony of the victim of an assault to conclude that the defendant was armed with a knife during the commission of the crime. (*Id.* at p. 126.) The fact that the defendant was armed with a knife elevated the assault to a serious felony and a strike that could serve as a prior to enhance the defendant's sentence. (*Ibid.*) Our Supreme Court concluded that it was improper for the trial court to use the victim's testimony at the preliminary hearing in finding that the defendant was armed with a knife while committing the assault when the defendant did

27

not adopt the testimony as a factual basis for the guilty plea. (*Id.* at p. 136.) The trial court was only permitted to consider the plea itself, and the defendant did not specify that she used a knife when entering her guilty plea. (*Ibid.*)

Webb also cites *People v. Strike* (2020) 45 Cal.App.5th 143 (*Strike*), in which the Fourth District Court of Appeal applied *Gallardo*, finding that the trial court "engaged in impermissible judicial factfinding" by considering the factual allegations in the charging document to find that the defendant committed the offense with another gang member, making the crime a prior strike. (*Id.* at p. 153.) In *Strike*, the defendant pleaded guilty to participating in a criminal street gang (§ 186.22, subd. (a)), which was reflected in his change of plea form. However, the fact that he participated in the crime with another gang member was not part of the plea form; rather, it was contained in the charging documents. (*Strike*, at p. 153.) The change of plea form did not refer to the defendant's plea to the charge "as alleged." (*Ibid.*) Therefore, the *Strike* court held it was improper for the trial court to consider the allegations in the charging document. (*Ibid.*)

Webb's reliance on both *Gallardo* and *Strike* is misplaced. In *Gallardo*, the defendant's guilty plea to assault contained no reference to the fact that she was armed with a deadly weapon and did not adopt the testimony elicited at the preliminary hearing as a factual basis of her guilty plea. As a result, there were no facts in the record of conviction from which the trial court could conclude that Gallardo was armed with a knife when she committed the assault. Similarly, in *Strike*, the defendant's change of plea form for his guilty plea made no reference to the defendant committing the crime with a gang member nor did it refer to the defendant pleading guilty to the crime "as alleged." Therefore, there were no facts upon which the court could properly rely that the defendant committed the crime with a gang member. Here, on the other hand, Webb's record of conviction includes facts from which to conclude that he was armed with a knife when he committed armed robbery and aggravated battery. Webb pleaded no contest to armed robbery and aggravated battery (deadly weapon), with a specific

28

reference to the allegations in the information that Webb was armed with a knife. It was not improper for the trial court in this case to consider the criminal information because Webb pleaded to the crimes "as charged in the criminal information." The criminal information provides the facts necessary to demonstrate that Webb was armed with a knife during the commission of the crimes.

The armed robbery to which Webb pleaded no contest involved the taking of property "by the use of force or threats of force while armed with a knife." The fact that the record of conviction establishes that Webb was armed with a knife when he committed the robbery is sufficient to satisfy the requirements of robbery in California. The New Mexico robbery conviction thus qualifies as a prior strike (§§ 667, subds. (b)-(i); 1170.12), and a prior serious felony conviction (§ 667.5, subd. (a)).

### 2. *Aggravated Battery*

As with the New Mexico robbery conviction, Webb argues that his New Mexico conviction for aggravated battery is not a California equivalent. We are not persuaded.

Webb pled no contest to aggravated battery (deadly weapon), which in New Mexico is defined as: "A. Aggravated battery consists of the unlawful touching or application of force to the person of another with intent to injure that person or another. [¶] B. Whoever commits aggravated battery, inflicting an injury to the person which is not likely to cause death or great bodily harm, but does cause painful temporary disfigurement or temporary loss or impairment of the functions of any member or organ of the body, is guilty of a misdemeanor. [¶] C. Whoever commits aggravated battery inflicting great bodily harm or does so with a deadly weapon or does so in any manner whereby great bodily harm or death can be inflicted is guilty of a third degree felony." (N.M. Stat. Ann. § 30-3-5.) Aggravated battery with a deadly weapon under New Mexico law does not require serious bodily injury; rather, it only requires that a deadly weapon be used. (*Ibid.*)

29

The criminal information alleged that Webb committed the crime of aggravated battery (deadly weapon) as follows: "[O]n or about February 20, 2009, [Webb] did touch or apply force to the person of Pete Casen with a deadly weapon to wit; a knife, a third-degree felony, contrary to Section 30-3-5, NMSA 1978." The plea and disposition agreement states that Webb pleaded no contest to "[c]ount 2: Aggravated Battery (Deadly Weapon), § 30-3-5, NMSA 1978, a third-degree felony." The judgment provided that Webb "was convicted on June 11, 2009, pursuant to a no contest plea accepted by the court of the offense[] of Aggravated Battery (Deadly Weapon), a third degree felony, contrary to § 30-3-5 (C), NMSA 1978, as charged in Count 2 of the Criminal Information[.]"

Simple battery in California is defined in section 242 as "any willful or unlawful use of force or violence upon the person of another." Felony battery is defined in section 243, subdivision (d) as "[w]hen a battery is committed against any person and serious bodily injury is inflicted on that person . . . ." Assault with a deadly weapon under California law is defined as follows: "an assault upon the person of another with a deadly weapon . . . ." (§ 245, subd. (a)(1).) "Assault" is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Assault with a deadly weapon in violation of section 245 qualifies as a strike because it is defined as a serious felony under section 1192.7, subd. (c)(31).

Aggravated battery in New Mexico requires that an actual battery must occur, whereas assault with a deadly weapon in California requires only an attempted battery. (N.M. Stat. Ann. § 30-3-5; §§ 245, subd. (a)(1); 240.) Therefore, because the New Mexico statute requires more than the California statute, the New Mexico crime is necessarily encompassed in the California crime. A violation of the New Mexico statute for aggravated battery (deadly weapon) (N.M. Stat. Ann. § 30-3-5, subd. (C)), is also a violation of the California statute for assault with a deadly weapon (§ 245, subd. (a)(1).)

Webb pled no contest to aggravated battery (deadly weapon), as alleged in count 2 of the criminal information. The criminal information alleged that Webb committed aggravated battery by appl**y**ing force to the victim with a knife. This conduct by definition qualifies as an assault with a deadly weapon pursuant to section 245, subd. (a)(1), which is defined as "an assault upon the person of another with a deadly weapon . . . ." (§ 245, subd. (a)(1).)

As we concluded regarding Webb's armed robbery conviction, we are not persuaded by his argument that the trial court could not consider the facts in the criminal information when determining that he was armed with a knife during the commission of the New Mexico crimes. The judgment reflects that Webb pled no contest to counts 1 and 2 as alleged in the criminal information. We do not agree that the original information was amended by the plea form to remove the facts supporting the criminal charges. Webb's plea to aggravated battery (deadly weapon), included the admission that he used force against the victim with a knife. Therefore, there is substantial evidence to support the trial court's conclusion that the conviction qualifies as a strike under sections 667, subdivisions. (b)-(i) and 1170.12.[8]

### J. Remand for Resentencing Pursuant to Senate Bill No. 1393

At the time of Webb's sentencing, the trial court was required to impose the five-year enhancement under section 667, former subdivision (a)(1), based on Webb's prior serious felony conviction. However, effective January 1, 2019, section 667, subdivision (a)(1), and section 1385 were amended to permit a trial court, in the furtherance of justice, to strike or dismiss a five-year enhancement under section 667, subdivision (a)(1). (Sen. Bill No. 1393, ch. 1013, §§ 1, 2.)

---

[8] The trial court granted Webb's *Romero* motion, and struck the prior aggravated battery conviction for the purpose of sentencing. The trial court found the allegation that the prior aggravated battery qualified as a prior serious felony pursuant to section 667, subdivision (a) not true following the court trial.

Webb argues his case should be remanded for the trial court to exercise its discretion to strike his prior serious felony conviction enhancement. The parties agree that the statutory amendments apply retroactively in this case. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971-973; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 424-425 (*McDaniels*).) The parties disagree as to whether remand for resentencing is required in this case.

The Attorney General argues remand would be futile in this case because the trial court's sentencing decisions demonstrate that it would not have stricken Webb's prior serious felony conviction enhancement even if it had the discretion to do so. Specifically, the trial court imposed the aggravated term for the mayhem and assault convictions, noting that the crimes involved "great violence showing a high degree of cruelty, viciousness, and callousness[.]" The Attorney General asserts the fact that the trial court found the crimes to be violent, and imposed the aggravated term as a result, demonstrates that remand for the trial court to exercise its discretion would be futile.

A defendant is entitled to " 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion. [Citation.] But if ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' [Citation.]" (*McDaniels, supra,* 22 Cal.App.5th at p. 420; see also, *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; [if the record clearly indicates that the trial court would have reached the same conclusion even if it had been aware that it had discretion, remand for resentencing is not required].)

We are not persuaded the trial court's sentencing decisions and findings in this case unequivocally demonstrate that it will not exercise its newfound discretion to strike the prior serious felony enhancement. " '[W]hen the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is

necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.]" (*McDaniels, supra,* 22 Cal.App.5th at p. 420.)

At the time Webb was sentenced, the trial court lacked the discretion to strike or stay the prior serious felony enhancement. Webb is entitled to be sentenced in the exercise of informed discretion and remand is appropriate so that the trial court may exercise its discretion in the first instance in light of the amendments to sections 667 and 1385. We express no opinion on how the trial court should exercise its discretion on remand. (*McDaniels, supra*, 22 Cal.App.5th at p. 428.)

## III. DISPOSITION

The judgment is reversed, and the matter is remanded for the sole purpose of resentencing, and for the trial court to exercise its discretion whether to strike the five-year serious felony enhancement under section 667, subdivision (a)(1). (Sen. Bill No. 1393, ch. 1013, §§ 1, 2.)

_____
Greenwood, P. J.

WE CONCUR:


_____
 Elia, J.


_____
 Bamattre-Manoukian, J.


People v. Webb
H045312